**No. 24-40568**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF MONTANA,

Plaintiffs-Appellees,

v.

XAVIER BECERRA, *Secretary, U.S. Department of Health and Human Services*; MELANIE FONTES RAINER, *Director*, CENTERS FOR MEDICARE AND MEDICAID SERVICES; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

## BRIEF FOR APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

CHARLES W. SCARBOROUGH
McKAYE L. NEUMEISTER
  *Attorneys, Appellate Staff
  Civil Division, Room 7231
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 514-8100*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties. 5th Cir. R. 28.2.1.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## STATEMENT REGARDING ORAL ARGUMENT

The district court's stay order prevents the Department of Health and Human Services from implementing an important rule that is necessary to fully effectuate Section 1557's prohibition against sex discrimination in health programs and activities. Because the district court's analysis is inconsistent with decisions from numerous other federal courts of appeals and district courts, the federal government believes that oral argument would aid in the consideration of this appeal.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION ..............................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF THE ISSUE...........................................................................3

STATEMENT OF THE CASE ............................................................................3

    A.    Statutory and Regulatory Background ..........................................3

    B.    Prior Proceedings........................................................................9

    C.    Related Litigation ......................................................................12

SUMMARY OF ARGUMENT.......................................................................... 15

STANDARD OF REVIEW ............................................................................... 17

ARGUMENT ................................................................................................... 17

I.    The States Are Unlikely to Prevail on the Merits of Their Challenge. ............... 17

    A.    Gender-identity discrimination is necessarily a form of discrimination on the basis of sex. ...............................................17

    B.    The States' challenge is unripe. ..................................................26

II.    At a Minimum, the Stay Is Overbroad. ................................................... 34

    A.    The scope of relief was broader than necessary to address the States' asserted harms regarding gender-affirming care............................34

    B.    The district court abused its discretion in granting nationwide relief............................................................................................38

CONCLUSION ................................................................................................ 44

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) ...................................................... 20

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................. 26

*Alabama v. Cardona*,
  No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024),
  *appeal docketed*, No. 24-12444 (11th Cir. July 30, 2024) ......................... 13-14

*Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*,
  78 F.4th 210 (5th Cir. 2023), *rev'd on other grounds*,
  602 U.S. 367 (2024) ................................................................. 17,42

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ....................................................... 39

*Arkansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__,
  No. 4:24-cv-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024),
  *appeal docketed*, No. 24-2921 (8th Cir. Sept. 23, 2024) ...............................14

*Arnold, Constable & Co. v. United States*,
  147 U.S. 494 (1893) ................................................................. 25

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ............................... 2, 4, 6, 15, 19, 20, 21, 22, 23, 25, 35

*Braidwood Mgmt., Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ...................................................... 40, 41

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) ....................................................... 24

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................. 34, 39, 42

*Carder v. Continental Airlines, Inc.*,
  636 F.3d 172 (5th Cir. 2011) ....................................................... 25

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024) ....................................................... 37-38, 41, 43

v

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, __F. Supp. 3d__,
  No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024),
  *appeal docketed*, No. 24-10824 (5th Cir. Sept. 10, 2024) ..................................14

*Department of Educ. v. Louisiana*,
  603 U.S. 866 (2024) ................................................................. 14

*Department of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) .............................................................. 39

*Florida v. HHS*, __F. Supp. 3d__, No. 8:24-cv-1080-WFJ-TGW,
  2024 WL 3537510 (M.D. Fla. July 3, 2024) ...........................13, 40, 43

*Franklin v. Gwinnett Cty. Pub. Sch.*,
  503 U.S. 60 (1992) .................................................................. 23

*Gill v. Whitford*,
  585 U.S. 48 (2018) .............................................................. 16, 38

*Grabowski v. Arizona Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ................................................. 20

*Grimm v. Gloucester Cty. Sch. Bd.*,
  972 F.3d 586 (4th Cir.), as amended (Aug. 28, 2020) .................. 20

*Gross v. FBL Fin. Servs., Inc.*,
  557 U.S. 167 (2009) ............................................................... 24

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ......................................................... 1, 1-2

*Kansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__,
  No. 24-cv-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024),
  *appeal docketed*, No. 24-3097 (10th Cir. July 11, 2024) ...................14

*Labrador v. Poe ex rel. Poe*,
  144 S. Ct. 921 (2024) ................................................. 11, 34, 39, 40

*Lakoski v. James*,
  66 F.3d 751 (5th Cir. 1995) ......................................... 15, 20, 24

*Lopez v. City of Houston*,
  617 F.3d 336 (5th Cir. 2010) .................................................. 26

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ......................................... 40, 41, 42

*Louisiana v. U.S. Dep't of Educ.*, __F. Supp. 3d__,
  No. 3:24-cv-00563, 2024 WL 2978786 (W.D. La. June 13, 2024) ............................14

*Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*,
  No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) ......................................... 14

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ...........................................................................................................23

*Monk v. Huston*,
  340 F.3d 279 (5th Cir. 2003) ........................................................................................ 26

*National Park Hosp. Ass'n v. Department of the Interior*,
  538 U.S. 803 (2003) ......................................................................................... 27, 31, 34

*Neese v. Becerra*,
  640 F. Supp. 3d 668 (N.D. Tex. 2022) .......................................................................... 23

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................................................ 32

*Oklahoma v. Cardona*, __F. Supp. 3d__,
  No. 5:24-cv-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024),
  *appeal docketed*, No. 24-6205 (10th Cir. Sept. 27, 2024) .................................................14

*Pederson v. Louisiana State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ........................................................................................ 24

*Pennzoil Co. v. FERC*,
  645 F.2d 394 (5th Cir. 1981) ........................................................................................ 27

*Ryan LLC v. FTC*, __F. Supp. 3d__,
  No. 3:24-cv-00986-E, 2024 WL 3297524 (N.D. Tex. July 3, 2024) .........................43

*Sample v. Morrison*,
  406 F.3d 310 (5th Cir. 2005) ........................................................................................ 26

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ........................................................................................................ 22

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ................................................................................................. 42

*Tennessee v. Cardona*, __F. Supp. 3d__,
  No. 2:24-cv-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024),
  *appeal docketed*, No. 24-5588 (6th Cir. June 26, 2024) ...................................................14

*Tennessee v. Becerra*, __F. Supp. 3d__,
No. 1:24-cv-161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024)................13

*Texas v. United States*, __F. Supp. 3d__,
No. 2:24-cv-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024),
*appeal docketed*, No. 24-10832 (5th Cir. Sept. 13, 2024) ................................14

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985) ........................................................................... 26, 28, 31

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................................ 39

*United States v. Texas*,
599 U.S. 670 (2023) .......................................................................... 39, 40, 43

*United Transp. Union v. Foster*,
205 F.3d 851 (5th Cir. 2000) ......................................................................... 31

*Van Garderen v. State*,
No. DV 2023-541 (Mont. 4th Jud. Dict. Ct. Sept. 27, 2023),
*appeal docketed*, No. DA 23-0572 (Mont. Sept. 27, 2023) ............................. 33

*VanDerStok v. Garland*,
86 F.4th 179 (5th Cir. 2023), *cert. granted*, 144 S. Ct. 1390 (2024) ............... 43

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
248 F.3d 411 (5th Cir. 2001) ......................................................................... 17

## U.S. Constitution:

Art. III, § 2, cl. 1 ........................................................................................... 26

## Statutes:

Title VII of the Civil Rights Act of 1964:
42 U.S.C. § 2000e-2(a)(1) ........................................................................ 4, 19
42 U.S.C. § 2000e-2(e) ................................................................................. 25

Title IX of the Education Amendments of 1972:
20 U.S.C. § 1681 *et seq.* ................................................................................ 4
20 U.S.C. § 1681(a) .......................................................... 3, 17, 20, 21, 22
20 U.S.C. §§ 1682-1683 ................................................................................ 4

20 U.S.C. § 1683 ......................................................................... 30

5 U.S.C. § 705 ................................................. 2, 3, 9, 13, 17, 40, 41, 42

5 U.S.C. § 706 ..................................................................... 41, 43

28 U.S.C. § 1292(a)(1) ................................................................. 3

28 U.S.C. § 1331 ....................................................................... 2

28 U.S.C. § 1346 ....................................................................... 2

28 U.S.C. § 1361 ....................................................................... 2

42 U.S.C. § 18116(a) ..................................................... 3, 4, 17, 30

42 U.S.C. § 18116(c) ................................................................... 3

**Regulatory Materials:**

42 C.F.R. § 438.3(d)(4) ....................................... 8, 12, 18, 37

42 C.F.R. § 438.206 ............................................................... 8

42 C.F.R. § 438.206(c)(2) ........................................... 12, 18, 37

42 C.F.R. § 440.262 ....................................... 8, 12, 18, 37

42 C.F.R. § 460.98 ............................................................... 8

42 C.F.R. § 460.98(b)(3) ........................................... 12, 18, 37

42 C.F.R. § 460.112 ............................................................. 8

42 C.F.R. § 460.112(a) ............................................. 12, 18, 37

45 C.F.R. § 80.7 ................................................................. 29

45 C.F.R. § 80.7(a)-(d) ......................................................... 4

45 C.F.R. § 80.7(c) ............................................................. 30

45 C.F.R. § 80.7(d)(1) ......................................................... 30

45 C.F.R. § 80.8(a) ....................................................... 4, 30

45 C.F.R. § 80.8(c) ............................................................................ 30

45 C.F.R. § 80.8(d) ............................................................................ 30

45 C.F.R. § 80.9 ............................................................................ 30

45 C.F.R. § 80.11 ............................................................................ 30

45 C.F.R. § 86.71 ............................................................................ 29

45 C.F.R. § 92.5 ............................................................................ 8

45 C.F.R. § 92.5(a) ............................................................................ 29

45 C.F.R. § 92.6 ............................................................................ 8

45 C.F.R. § 92.7 ............................................................................ 8

45 C.F.R. § 92.8 ............................................................................ 8

45 C.F.R. § 92.9 ............................................................................ 8

45 C.F.R. § 92.10 ............................................................................ 8

45 C.F.R. § 92.101(a)(2) .................................................... 5, 12, 18, 19, 36

45 C.F.R. § 92.101(a)(2)(iv) ............................................................ 1, 19

45 C.F.R. § 92.206 ............................................................................ 6

45 C.F.R. § 92.206(a) ............................................................................ 6

45 C.F.R. § 92.206(b) ................................................................... 12, 18

45 C.F.R. § 92.206(b)(1) ............................................................................ 6

45 C.F.R. § 92.206(b)(1)-(2) ................................................................... 36

45 C.F.R. § 92.206(b)(3) ................................................................... 37

45 C.F.R. § 92.206(b)(4) ............................................................................ 6

45 C.F.R. § 92.206(c) ................................................................... 7, 28, 30, 32

45 C.F.R. § 92.207 ............................................................................ 6

45 C.F.R. § 92.207(b)(3) ....................................................... 36

45 C.F.R. § 92.207(b)(3)-(4) ................................................. 7

45 C.F.R. § 92.207(b)(3)-(5) ............................................ 12, 18

45 C.F.R. § 92.207(c) ................................... 7, 28, 29, 30, 32

45 C.F.R. § 92.303(a) .......................................................... 4

Exec. Order No. 13,988, 86 Fed. Reg. 7023 (Jan. 25, 2021) ........................................... 4

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................... 3

Fed. R. Civ. P. 23 .............................................................. 39

**Legislative Material:**

H.R. Rep. No. 79-1980 (1946) ...........................................42

**Other Authorities:**

81 Fed. Reg. 31,375 (May 18, 2016) ...................................... 4

85 Fed. Reg. 37,160 (June 19, 2020) ..................................... 4

86 Fed. Reg. 27,984 (May 25, 2021) ...................................... 5

87 Fed. Reg. 47,824 (Aug. 4, 2022) ....................................... 5

*Nondiscrimination in Health Programs and Activities,*
    89 Fed. Reg. 37,522 (May 6, 2024) ................................. 1, 5, 6, 7, 8, 18, 21, 28, 29, 32

*Nondiscrimination on the Basis of Sex in Education Programs or Activities*
    *Receiving Federal Financial Assistance,*
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ............................................. 13

## INTRODUCTION

Section 1557 of the Affordable Care Act prohibits various forms of discrimination in health programs and activities that receive federal financial assistance. The statute does so by incorporating the grounds of discrimination prohibited in various other federal civil rights statutes, including Title IX of the Education Amendments of 1972. Title IX, in turn, prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave [Title IX] a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

Congress authorized the Department of Health and Human Services (HHS) to issue regulations to implement Section 1557's prohibition on sex discrimination and the other grounds of prohibited discrimination in health programs and activities. In May 2024, HHS exercised that delegated authority by issuing a rule promulgating new implementing regulations for Section 1557. *See Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (May 6, 2024) (Rule). As relevant here, 45 C.F.R. § 92.101(a)(2)(iv) clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex. And the Rule contains several provisions explaining how the prohibition on gender-identity discrimination applies in the context of providing healthcare and health insurance coverage. Those provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at

175—as applied to the health context by Section 1557—and are consistent with precedent of this Court and the Supreme Court.

Plaintiffs' challenge to these provisions is meritless.  Section 92.101(a)(2)(iv) flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  590 U.S. 644, 660 (2020).  That essential insight—which the Supreme Court held followed unambiguously from the plain meaning of the phrase "because of sex"—is not confined to Title VII; it applies equally to Title IX's prohibition against discrimination "on the basis of sex," as incorporated by Section 1557.

The district court nevertheless entered a sweeping order staying the effective date of the Rule nationwide as to certain challenged provisions under 5 U.S.C. § 705.  In so doing, the court erred by refusing to apply *Bostock*'s central teaching to the materially indistinguishable language of Title IX.  And the court failed to justify granting nationwide relief that extends well beyond the circumstances in which plaintiffs have asserted any irreparable harm.

This Court should vacate the stay.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361.  ROA.10.  The district court entered a stay under 5 U.S.C. § 705 on July 3, 2024, and issued an

order modifying that stay on August 30, 2024.  *See* ROA.204-231, 347-350.  Defendants

timely appealed on August 30, 2024.  ROA.352-353; Fed. R. App. P. 4(a)(1)(B).  This

Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In May 2024, HHS issued a rule promulgating new regulations implementing

Section 1557 of the Affordable Care Act.  After finding that plaintiffs were likely to

succeed on their challenge to the inclusion of gender-identity discrimination under the

Rule, the district court issued a nationwide stay of the effective date of the Rule under

5 U.S.C. § 705 as to certain challenged provisions.  The question presented is whether

the district court erred in entering the § 705 stay.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

Section 1557 of the Affordable Care Act provides that "an individual shall not,

on the ground prohibited under" various other civil rights statutes "be subjected to

discrimination under, any health program or activity" receiving federal financial

assistance.  42 U.S.C. § 18116(a).  One of the specified statutes is Title IX of the

Education Amendments of 1972, which provides that "[n]o person … shall, on the

basis of sex" "be subjected to discrimination under any education program or activity

receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Congress authorized HHS

to "promulgate regulations to implement [Section 1557]."  42 U.S.C. § 18116(c).  And

Congress established a detailed administrative enforcement scheme requiring HHS to

3

first attempt to secure compliance through voluntary means before it may suspend or terminate federal financial assistance, or refer a matter to the Department of Justice for enforcement. *See* 20 U.S.C. §§ 1682-1683 (incorporated by 42 U.S.C. § 18116(a)); *see also* 45 C.F.R. §§ 80.7(a)-(d), 80.8(a); 45 C.F.R. § 92.303(a).

HHS promulgated regulations implementing Section 1557's prohibition on sex discrimination in 2016, and again in 2020. *See* 81 Fed. Reg. 31,375 (May 18, 2016) (2016 Rule); 85 Fed. Reg. 37,160 (June 19, 2020) (2020 Rule) (rescinding the 2016 Rule's provisions defining sex discrimination). Three days after HHS submitted the 2020 Rule for publication in the Federal Register, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation or gender identity. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020). Following *Bostock*, and after a change in administration, the President issued an executive order explaining that "[u]nder *Bostock*'s reasoning, laws that prohibit sex discrimination—including Title IX of the Education Amendments of 1972, as amended (20 U.S.C. [§] 1681 *et seq.*) …—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 25, 2021) (citations omitted). The President thus directed agencies to "consider whether to" take any actions "necessary to fully implement statutes that prohibit sex discrimination," "consistent with applicable law." *Id.* at 7024. In May 2021, HHS issued a notification

to inform the public that, consistent with *Bostock* and Title IX, HHS would interpret and enforce Section 1557's prohibition on sex discrimination as including discrimination based on sexual orientation and gender identity.  86 Fed. Reg. 27,984 (May 25, 2021) (2021 Notice of Interpretation).

In July 2022, HHS issued a Notice of Proposed Rulemaking, which—among other things—proposed to interpret Section 1557's prohibition against sex discrimination to include discrimination based on gender identity.  87 Fed. Reg. 47,824 (Aug. 4, 2022).  Following an extensive public engagement process, HHS issued the final Rule on May 6, 2024.  The Rule made numerous changes to the Section 1557 regulations.

As particularly relevant here, the Rule contains a number of provisions pertinent to the statutory prohibition on sex discrimination.  Section 92.101(a)(2) describes the scope of prohibited sex discrimination under Section 1557.  It provides that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and (v) Sex stereotypes." 45 C.F.R. § 92.101(a)(2).  HHS explained that "the inclusion of 'sexual orientation' and 'gender identity' in § 92.101(a)(2) is consistent with the Supreme Court's reasoning in *Bostock*."  89 Fed. Reg. at 37,574.  And HHS determined that it was "not necessary to define 'sex' in this rule," observing that in *Bostock* the "Supreme Court did not define the term 'sex'"; instead the Court explained that nothing in its analysis "turned on the

debate over whether 'sex' was limited to 'biological distinctions between male and female,' and the Court therefore proceeded on the assumption that 'sex' carried that meaning." *Id.* at 37,575 (quoting *Bostock*, 590 U.S. at 655).

The Rule also addresses equal program access on the basis of sex, 45 C.F.R. § 92.206, and insurance coverage, *id.* § 92.207. Section 92.206 applies primarily to those that provide direct healthcare services to patients, such as hospitals, and requires the provision of "equal access to [a provider's] health programs and activities without discriminating on the basis of sex." *Id.* § 92.206(a). For instance, § 92.206(b)(1) provides that covered providers must not "[d]eny or limit health services … to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(1). Accordingly, under (b)(1), a healthcare provider could not refuse to treat the broken arm of a transgender patient because of that patient's gender identity. Another provision within this section additionally precludes covered providers from denying or limiting health services sought for the purpose of gender-affirming care "that the covered entity would provide to an individual for other purposes if the denial or limitation is based on an individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* § 92.206(b)(4). Section 92.206 explains, however, that it does not "require[] the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where … the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual."

*Id.* § 92.206(c). This provision thus makes clear that no violation of Section 1557 occurs where the denial is based on "a legitimate, nondiscriminatory reason" and not "unlawful animus or bias," or does not "constitute a pretext for discrimination." *Id.*

Section 92.207 contains specific prohibitions applicable to covered entities that provide insurance or other health-related coverage, including provisions prohibiting insurance issuers from "deny[ing] or limit[ing] coverage" "based upon" an individual's "gender identity," and precluding insurance issuers from "hav[ing] or implement[ing] a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care." 45 C.F.R. § 92.207(b)(3)-(4). Again, however, § 92.207 makes clear that it does not "require[] coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements." *Id.* § 92.207(c). As with program access under § 92.206, a "coverage denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination." *Id.* Where a "medical necessity determination" to deny coverage constitutes a "bona fide medical judgment," it would not amount to impermissible discrimination under § 92.207. *See* 89 Fed. Reg. at 37,613.

Beyond these provisions explaining how the prohibition on gender-identity discrimination applies in the context of providing healthcare and health insurance

coverage, the Rule contains a number of provisions that are relevant to implementing the prohibition on sex discrimination more generally—without specific regard to whether that prohibition covers gender identity or gender-affirming care.[1]  *See, e.g.*, 45 C.F.R. § 92.5 (requiring assurance of nondiscrimination); *id.* § 92.6 (addressing remedial and voluntary actions by recipients); *id.* § 92.7 (requiring Section 1557 coordinator); *id.* § 92.8 (requiring written nondiscrimination policy); *id.* § 92.9 (governing training); *id.* § 92.10 (addressing notice of nondiscrimination).  The Rule's effective date was July 5, 2024 (unless otherwise specified for certain provisions). 89 Fed. Reg. at 37,693.

---

[1] The Rule also revised nondiscrimination provisions of certain Centers for Medicare & Medicaid Services (CMS) regulations governing Medicaid, Programs of All-Inclusive Care for the Elderly (PACE), the Children's Health Insurance Program (CHIP), health insurance Exchanges, and certain plans in the commercial health insurance market.  *See* 89 Fed. Reg. at 37,666-75.  For example, those CMS regulations require contracts between states and Medicaid and CHIP managed care plans to include provisions that preclude discrimination against enrollees.    As relevant here, § 438.3(d)(4) adds discrimination on the basis of gender identity to the list of provisions prohibiting sex-based discrimination that must be included in such contracts. 42 C.F.R. § 438.3(d)(4); *see also id.* § 438.206 (addressing the delivery of services by managed care plans in a culturally competent manner); *id.* § 440.262 (requiring state Medicaid programs, both fee-for-service and managed care, to have methods to promote access and delivery of services in a culturally competent manner, regardless of sex, including gender identity); *id.* § 460.98 (prohibiting PACE organizations from discriminating against PACE participants based on sex, including gender identity); *id.* § 460.112 (providing that PACE participants have the right not to be discriminated against in the delivery of required PACE services based on sex, including gender identity).

## B.    Prior Proceedings

**1.**    Plaintiffs are the States of Texas and Montana (collectively, States).  The States brought this action under the Administrative Procedure Act (APA).  As relevant here, the States challenged the Rule's treatment of gender-identity discrimination and sought preliminary-injunctive relief and a stay of the Rule's effective date, claiming that the application of the Rule with respect to the provision of gender-affirming care will cause them irreparable harm.  *See* ROA.51-53, 61 (Stay Motion 4-6, 14).

**2.**    On July 3, 2024, the district court stayed the effective date of the Rule in its entirety under 5 U.S.C. § 705 within the states of Texas and Montana.  ROA.230 (Opinion 27).  The court held that the States were likely to succeed on the merits of their claim that the Rule conflicts with Title IX and thus "violates the APA" in recognizing that sex discrimination under Section 1557 encompasses gender-identity discrimination.  ROA.220 (Opinion 17).[2]

According to the district court, when Congress prohibited discrimination on the basis of sex in Title IX in 1972, "'sex' unambiguously meant only a person's biological sex—an immutable characteristic determined solely by the accident of birth."  ROA.215 (Opinion 12) (quotation marks omitted).  The court thus determined that "Title IX prohibits discrimination 'between males and females' only."  ROA.215 (Opinion 12).  The court rejected HHS's reliance on *Bostock*, concluding that "the Supreme Court's

---

[2] In light of this holding, the court declined to address plaintiffs' other bases for challenging the Rule.  ROA.213 n.5 (Opinion 10 n.5).

reasoning in *Bostock* does not apply to Section 1557 or Title IX" because "*Bostock* relied heavily on the phrase 'because of' in Title VII," whereas "Title IX does not include similar language." ROA.218 (Opinion 15). The court further emphasized that Title VII concerns employment discrimination, whereas Title IX and Section 1557 address educational and healthcare discrimination. ROA.219 (Opinion 16). The court thus concluded that HHS had impermissibly "contradict[ed] the language of the statute" in providing that sex discrimination includes gender-identity discrimination. ROA.220 (Opinion 17).[3]

As to the remaining factors, the district court concluded that the States faced irreparable harm because they were "likely to lose billions of dollars in federal funding for their Medicaid and CHIP programs for refusing to comply." ROA.223 (Opinion 20). The court further concluded that the States faced injury in the form of "interfere[nce] with the enforcement of state law" barring the provision of gender-affirming medical treatment. ROA.225-226 (Opinion 22-23). And the court concluded that the balance of equities and public interest favored a stay. ROA.227-228 (Opinion 24-25).

With respect to the scope of relief, the district court observed that "[t]he permissive language of § 705 grants … considerable discretion in crafting relief," and

---

[3] The district court further concluded that separate statutory authority invoked by HHS did not independently justify the relevant amendments to the CMS regulations implementing the prohibition on gender-identity discrimination. ROA.220-222 (Opinion 17-19).

that courts "should generally not impose relief that is 'more burdensome to the defendant than necessary' to redress the plaintiff's injuries." ROA.229 (Opinion 26) (quoting *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in the grant of stay)). Regarding geographic scope, the court noted that whereas "Texas and Montana have demonstrated injuries that they and covered providers in these two States are likely to suffer," there was "no evidence of potential imminent harm to other parties." ROA.229 (Opinion 26). Accordingly, "a stay limited to all covered entities within Texas and Montana accords with the record before the Court." ROA.229 (Opinion 26). As to the substantive scope of the stay, the court observed that although the Rule contains a severability clause, HHS had "provide[d] no guidance on how the Court should excise the offending provisions." ROA.230 (Opinion 27). Accordingly, in issuing its stay order on July 3, 2024, the district court stayed the effective date of "all portions of the" Rule "as to Texas and Montana and all covered entities in those States." ROA.230 (Opinion 27).

**3.**    The States and the federal government filed motions seeking to modify the scope of relief. The States asked the district court to remove the geographic limits of its relief and "clarify that its Order stays the effective date of the [Rule] universally." ROA.240. The federal government opposed the States' request to render the stay nationwide, ROA.260-266, and further asked the court to reconsider the substantive scope of relief and "only stay those portions [of the Rule] that specifically concern the

provision of or coverage for gender-affirming care," *i.e.*, the portions actually challenged by the States.  ROA.252.

The district court granted both motions.  ROA.347-350.  The court explained that, in its view, "relief under § 705 should not be party restricted" and thus "the appropriate remedy is to stay the effective date of the [Rule] for all participants." ROA.349.  The court thus "extend[ed] the stay of the effective date of the [Rule] nationwide."  ROA.349.  As to defendants' reconsideration motion, the court explained that the federal government has "specifically identified the sections of the [Rule] … that are subject to Plaintiffs' challenge," ROA.349, and the court's review "confirms that only certain sections … rely on the challenged interpretation" and the "remaining" "unrelated" sections "should not be included in the stay," ROA.350.  Accordingly, the court ordered that the effective date of the Rule be stayed "nationwide" only as to certain listed sections:  42 C.F.R. §§ 438.3(d)(4), 438.206(c)(2), 440.262, 460.98(b)(3), 460.112(a); 45 C.F.R. §§ 92.101(a)(2) (and all references to this subsection), 92.206(b), 92.207(b)(3)-(5).  ROA.350.  The court did not, however, limit its stay of those provisions to only cover the extent that they implicate the provision of or coverage for gender-affirming medical care.

## C.   **Related Litigation**

**1.**   Several other challenges to the Section 1557 Rule are currently pending in courts in this Circuit and elsewhere.  *See Tennessee v. Becerra*, No. 24-60462 (5th Cir. filed Sept. 5, 2024) (opening brief filed Nov. 21, 2024); *Florida v. HHS*, No. 24-12826 (11th

Cir. filed Sept. 4, 2024) (opening brief due Jan. 2, 2025); *Catholic Benefits Ass'n v. Becerra*, No. 3:23-cv-203 (D.N.D. filed Oct. 13, 2023) (dispositive motions pending); *McComb Childrens Clinic, Ltd. v. Becerra*, No. 5:24-cv-48 (S.D. Miss. filed May 13, 2024) (dispositive motions pending); *Missouri v. Becerra*, No. 4:24-cv-937 (E.D. Mo. filed July 10, 2024) (awaiting scheduling order).  Two other district courts have issued similar orders staying the effective date of the Rule under 5 U.S.C. § 705, in addition to preliminarily enjoining its enforcement.  *See Florida v. HHS*, __F. Supp. 3d__, No. 8:24-cv-1080-WFJ-TGW, 2024 WL 3537510 (M.D. Fla. July 3, 2024); *Tennessee v. Becerra*, __F. Supp. 3d__, No. 1:24-cv-161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024).

**2.**    There is ongoing litigation raising similar legal questions in cases challenging a final rule issued by the Department of Education that implements Title IX's prohibition on sex discrimination in education programs.  *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).  Similar to the Section 1557 Rule, the Title IX rule also clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex.  Particularly relevant here is one of the challenges to the Title IX rule currently pending in this Court.  *See Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399 (5th Cir. filed June 25, 2024) (oral argument held Nov. 4, 2024).[4]

---

[4] Numerous other challenges to the Title IX rule are pending in cases around the country.  *See Alabama v. Cardona*, No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024) (denying preliminary injunction), *appeal docketed*, No. 24-12444 (11th Cir.

*Continued on next page.*

13

In *Louisiana*, the district court entered a preliminary injunction barring the Department of Education from enforcing the Title IX rule within the plaintiff states. *See Louisiana v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 3:24-cv-00563, 2024 WL 2978786, at *21 (W.D. La. June 13, 2024). The Department of Education sought to partially stay the injunction, and this Court denied the request. *See Louisiana ex rel. Murrill v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam). The federal government then asked the Supreme Court to partially stay the injunction pending appeal, and the Court denied the application. *Department of Educ. v. Louisiana*, 603 U.S. 866 (2024) (per curiam). The *Louisiana* appeal has since proceeded to briefing and oral argument in this Court.

---

July 30, 2024) (oral argument scheduled for Dec. 18, 2024); *Tennessee v. Cardona*, __F. Supp. 3d__, No. 2:24-cv-072-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-5588 (6th Cir. June 26, 2024) (oral argument held Oct. 30, 2024); *Kansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 24-cv-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-3097 (10th Cir. July 11, 2024) (reply brief filed Oct. 29, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-10824 (5th Cir. Sept. 10, 2024) (appeal stayed); *Texas v. United States*, __F. Supp. 3d__, No. 2:24-cv-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-10832 (5th Cir. Sept. 13, 2024) (appeal stayed); *Arkansas v. U.S. Dep't of Educ.*, __F. Supp. 3d__, No. 4:24-cv-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-2921 (8th Cir. Sept. 23, 2024) (opening brief filed Nov. 18, 2024); *Oklahoma v. Cardona*, __F. Supp. 3d__, No. 5:24-cv-00461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) (granting preliminary injunction), *appeal docketed*, No. 24-6205 (10th Cir. Sept. 27, 2024) (opening brief filed Nov. 19, 2024).

## SUMMARY OF ARGUMENT

**I.**    The district court erred in holding that the Rule is likely unlawful in its application to gender-identity discrimination.

**A.**    The Rule's provision addressing the scope of prohibited sex discrimination (§ 92.101(a)(2)) properly recognizes that gender-identity discrimination is necessarily a form of sex discrimination.  That conclusion follows directly from the plain statutory text of Title IX, which Section 1557 incorporates as relevant here, and from the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination.  That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to "biological distinctions between male and female."  *Id.* at 655 (quotation marks omitted).

None of the district court's reasons for distinguishing *Bostock* withstands scrutiny.  As this Court has recognized, "the prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same."  *Lakoski v. James*, 66 F.3d 751, 756-57, 756 n.3 (5th Cir. 1995).  Title IX sets out a causation standard no more stringent than Title VII's but-for standard, and this Court has consistently looked to Title VII case law to interpret Title IX.  The texts of the two provisions demonstrate that they serve the same relevant purpose of eradicating sex discrimination, and Title IX's various exemptions do not suggest that Title IX's core prohibition against discrimination "on the basis of sex" can be read differently than Title VII's prohibition on discrimination "because of

15

sex." The district court ran afoul of basic rules of statutory interpretation in concluding that "sex discrimination" carries different meanings in materially identical statutory texts.

**B.**    The States are also unlikely to succeed on the merits because their challenge is premature.  The States fear the loss of federal funding based on gender-affirming care policies that allegedly violate the Rule.   But any potential future enforcement action against plaintiffs for violating the Rule depends on a series of speculative contingencies that may never come to pass.  And postponing judicial review would not harm the States, given their ability to raise these same objections in the context of HHS administrative proceedings and subsequent judicial review.

The States' fear that the Rule could interfere with the enforcement of state laws also does not render their challenge ripe.  The assertion that HHS would find an actual conflict between the Rule and the relevant laws, after undertaking the necessary fact-specific analysis, is wholly conjectural.  And the States do not allege that they would in fact cease enforcing those state laws in the absence of a stay.

**II.**    Finally, the § 705 stay is, at a minimum, substantively and geographically overbroad.  The scope of relief issued by the district court—applying nationwide and to circumstances beyond the provision or coverage of gender-affirming medical care—vastly exceeded what was necessary to redress "the plaintiff[s'] particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).

Accordingly, this Court should vacate the district court's § 705 stay or, at a minimum, narrow the scope of relief to remedy only the asserted injuries of the specific plaintiff States.

## STANDARD OF REVIEW

This Court reviews the district court's "ultimate decision whether to grant or deny a preliminary injunction" for "abuse of discretion," but any legal conclusions supporting that decision are reviewed "*de novo*." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001). This Court applies the preliminary-injunction factors and the same standard of review in evaluating stays under 5 U.S.C. § 705. *See Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024).

## ARGUMENT

## I.    The States Are Unlikely to Prevail on the Merits of Their Challenge.

### A.    Gender-identity discrimination is necessarily a form of discrimination on the basis of sex.

Title IX prohibits discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and Section 1557 incorporates that ground of prohibited discrimination, 42 U.S.C. § 18116(a). Section 92.101(a)(2) of the Rule describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity; and

17

(v) Sex stereotypes."  45 C.F.R. § 92.101(a)(2).  HHS explained that this provision addresses a "non-exhaustive list of what constitutes discrimination on the basis of sex," and noted the Supreme Court's observation in *Bostock* that nothing in the Court's decision "turned on the debate over whether 'sex' was limited to 'biological distinctions between male and female.'"  89 Fed. Reg. at 37,575.  Each form of discrimination listed in § 92.101(a)(2) necessarily involves the consideration of a person's sex, even if "sex" refers only to biological differences between sexes.

The States' challenge here focuses on the Rule's inclusion of gender-identity discrimination as a form of sex discrimination, which is specifically provided in § 92.101(a)(2)(iv) and effectuated through various other provisions.  *See* ROA.213 (Opinion 10); ROA.48 (Stay Motion 1).[5]  The district court rejected the Rule's

---

[5] Although the district court's stay applies to various provisions of the Rule, the merits analysis as to all of those provisions for the claim on review turns on whether the prohibition on sex discrimination in Title IX, as incorporated by Section 1557, encompasses gender-identity discrimination.  The court acknowledged that the subject of the challenge at issue was the Rule's inclusion of gender-identity discrimination, *see, e.g.*, ROA.213, 220 (Opinion 10, 17); and the court purported to "limit[] the stay … only to the sections that are subject to Plaintiffs' challenge," ROA.349.  Those provisions include § 92.101(a)(2), which describes the scope of prohibited sex discrimination under Section 1557, 45 C.F.R. § 92.101(a)(2);  §§ 92.206(b) and 92.207(b)(3)-(5), which effectuate the prohibition on sex discrimination generally and gender-identity discrimination specifically with respect to equal program access and insurance coverage, *id.* §§ 92.206(b), 92.207(b)(3)-(5); and additional provisions in the Rule that could be relevant to carrying out the prohibition on sex discrimination.  *See* ROA.350 (including "all references to" 45 C.F.R. § 92.101(a)(2)); 42 C.F.R. §§ 438.3(d)(4), 438.206(c)(2), 440.262, 460.98(b)(3), 460.112(a) (CMS regulations).  Although the district court's relief extends more broadly to other provisions of the Rule, because the core issue—the inclusion of gender-identity discrimination within the scope of prohibited sex

*Continued on next page.*

recognition that the Supreme Court's reasoning in *Bostock*, when applied to the text of Title IX as incorporated by Section 1557, leads naturally to the conclusion that discrimination based on gender identity is necessarily a form of discrimination "on the basis of sex." *See* ROA.213-220 (Opinion 10-17). But the reasons the district court gave for that conclusion have no foundation in the text of the statutes and cannot be squared with the Supreme Court's analysis in *Bostock*.

      **1.**    Section 92.101(a)(2)(iv) reflects a straightforward application of *Bostock*'s reasoning. There, the Supreme Court construed the provision of Title VII making it unlawful "for an employer … to discriminate against any individual … because of such individual's … sex." *Bostock*, 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth

---

discrimination under Section 1557—is specifically addressed in 45 C.F.R. § 92.101(a)(2), the discussion herein focuses on that overarching provision. Demonstrating that HHS did not exceed its statutory authority in promulgating 45 C.F.R. § 92.101(a)(2)(iv) is sufficient to dispose of the States' claim at issue in its entirety.

for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even on the assumption that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655 (quotation marks omitted).

*Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Title IX imposes a causation standard no more stringent than but-for causation under Title VII. *See Lakoski v. James*, 66 F.3d 751, 756-57, 756 n.3 (5th Cir. 1995) ("[T]he prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same."). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school under Title IX (or a healthcare provider under Section 1557), no less than an employer under Title VII, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that, in light of *Bostock*, discrimination on the basis of sexual orientation or gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), as amended (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). That conclusion does not depend, as HHS recognized, on viewing the term "sex" in Title IX and Section 1557 to mean anything other than

20

"'biological distinctions between male and female.'"  89 Fed. Reg. at 37,575 (quoting *Bostock*, 590 U.S. at 655).

**2.**     None of the district court's reasons for rejecting that conclusion is valid. As an initial matter, the district court's reasoning appeared to stem from a fundamentally incorrect understanding of Title IX:  The district court suggested that Title IX is intended to protect only women from discrimination.  *See* ROA.219 (Opinion 16) ("[A]t the time Congress enacted Title IX, everyone understood the statute to prohibit treating members of one sex (women) worse than the other (men).").  But that claim has no basis in the text of the statute, which states that "[n]o person" shall be subject to discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  That expansive language reflects Congress's broad purpose of eliminating all forms of sex discrimination against people of any sex.

The court also endorsed the notion that the meaning of the term "sex" at the time of Title IX's passage referred only to "a person's biological sex," such that sex discrimination meant "discrimination between males and females only."  ROA.215 (Opinion 12) (quotation marks omitted) (citing dictionaries).  But the Rule does not purport to redefine "sex."  89 Fed. Reg. at 37,575 ("[HHS Office for Civil Rights (OCR)] has determined it is not necessary to define 'sex' in this rule ….").  It simply applies the same reasoning that the Supreme Court applied in *Bostock* to determine that discrimination on the basis of gender identity is necessarily discrimination on the basis

of sex, even assuming a definition of sex tied to "biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

The district court also dismissed *Bostock*'s relevance on the ground that the decision arose in the context of a Title VII claim. ROA.217-218 (Opinion 14-15). But *Bostock*'s core insight—that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual *based on* sex," 590 U.S. at 660 (emphasis added)—applies equally to Title IX and Section 1557. If an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female" yet "retains an otherwise identical employee who was identified as female at birth," the employer has engaged in discrimination based on sex assigned at birth because it has "intentionally penalize[d] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Exactly the same is true in the healthcare context: A healthcare provider that refuses to treat the broken arm of a transgender woman who was assigned male at birth because of that patient's gender identity has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because that provider has penalized the patient for traits it would have tolerated in an otherwise identical patient identified as female at birth. And as the Supreme Court has made clear, lower courts are bound not only by "the holdings of … prior cases, but also to their explications of the governing rules of law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) (quotation marks omitted). Plaintiffs may

disagree with what the Supreme Court said about sex discrimination in *Bostock*, but there is no basis for refusing to apply its reasoning to a statute with functionally identical text.

The district court emphasized that "*Bostock* relied heavily on the phrase 'because of' in Title VII to impose a sweeping standard of causation," whereas "Title IX does not include similar language, and the Supreme Court has not imposed a similar standard regarding the phrase 'on the basis of.'" ROA.218 (Opinion 15) (quotation marks omitted) (citing *Neese v. Becerra*, 640 F. Supp. 3d 668, 679 (N.D. Tex. 2022)).[6] But the court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different than Title IX's prohibition on discrimination "on the basis of" sex. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)); *see also Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (explaining that Title IX imposes "the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor "discriminate[s]" *on the basis of* sex'" (alteration in original) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (emphases added)). This Court has similarly used the phrases interchangeably

---

[6] *Neese* involves a challenge by healthcare providers to the 2021 Notice of Interpretation. The federal government appealed from an adverse judgment and the appeal is currently pending in this Court. *See Neese v. Becerra*, No. 23-10078 (5th Cir. argued Jan. 8, 2024).

in describing Title VII and Title IX. *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining *Bostock*'s holding that Title VII bars discrimination based on sexual orientation because it is "discrimination … '*on the basis of* sex'" (emphasis added)); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (explaining that a Title IX violation is present where an "institution intended to treat women differently *because of* their sex" (emphasis added)). And in other contexts, the Supreme Court has explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

The district court also suggested that the purpose of Title VII differs from those of Title IX and Section 1557. *See* ROA.219 (Opinion 16) (contrasting "discrimination in employment" with "discrimination in education" and "discrimination in healthcare"). But invocations of statutory purpose cannot undermine the straightforward textual analysis set out above. In any event, the relevant purpose of these statutes is the same: to root out sex discrimination in all its forms, albeit in different settings. *Lakoski*, 66 F.3d at 756-57, 756 n.3. Indeed, in emphasizing the allegedly different text and purpose of these statutes, the district court failed to grapple with this Court's precedents interpreting Title IX consistent with Title VII. This Court has explained that "[a]ny difference between the[ statutes'] prohibitions of sex discrimination is not compelled by statutory language," and both statutes protect "the same right." *Id.* at 756-57; *see*

*Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 180 (5th Cir. 2011) ("Based on its legislative history, this court has interpreted Title IX as being intended to prohibit a wide spectrum of discrimination against women in the same manner as Title VII."). Although *Lakoski* specifically involved *employment* discrimination in education, that fact is irrelevant; there is no basis for concluding that Title VII and Title IX proscribe the same forms of sex discrimination in the employment context, but that Title IX otherwise proscribes only a narrower category of sex discrimination.

Finally, the district court's observation that Title IX contains statutory provisions that allow sex separation in some contexts, ROA.216-217, does not compel a different understanding as to the scope of prohibited sex discrimination in the first instance. Title VII also contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation in certain contexts, like "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681. Yet the Supreme Court still held that gender-identity discrimination is necessarily also sex discrimination. Indeed, the presence of statutory provisions that explicitly permit sex differentiation in certain contexts under Title IX only reinforces that Congress understood that Title IX's general prohibition against sex discrimination otherwise applies. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation marks omitted)).

## B.    The States' challenge is unripe.

Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Ripeness is an "essential component[]" of "Article III's case-or-controversy requirement" because a court has no power to decide disputes that are not yet justiciable.  *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (per curiam).  The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

In order to assess whether a particular claim is ripe for judicial review, this Court considers both "(1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration."  *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010).  "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical."  *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) (quotation marks omitted).  If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe for adjudication.  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (quotation marks omitted).  Even when "the question presented" is "purely legal," it is unfit for adjudication where a concrete factual context would facilitate a court's "ability

26

to deal with the legal issues presented." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 812 (2003) (quotation marks omitted); *see also Pennzoil Co. v. FERC*, 645 F.2d 394, 398 (5th Cir. 1981) (legal issue not ripe where judicial review "would stand on a much surer footing in the context of an application to a specific factual framework").

In concluding that the States faced sufficient threatened harm from the Rule to justify their request for preliminary relief,[7] the district court focused on two alternate sources of potential injury:  either the "likely" loss of "billions of dollars in federal funding for [the States'] Medicaid and CHIP programs for refusing to comply" with the Rule, ROA.223 (Opinion 20); or, if the States were "forced … to comply with the [Rule]," harm in the form of the States being required to "violat[e] their own laws and precluded from enforcing those laws against others," ROA.225 (Opinion 22).  The States have not demonstrated ripeness with respect to either of those asserted harms.

**1.**     The States argue that the Rule threatens them with the loss of "billions of dollars in federal healthcare dollars" for not complying with the Rule because Texas and Montana's state-run health programs exclude coverage of various forms of gender-affirming medical care.  ROA.51-52 (Stay Motion 4-5); *see* ROA.51 (Stay Motion 4)

---

[7] The federal government raised ripeness in opposing preliminary relief. ROA.152 (Stay Opposition 18).  Although neither invoked the doctrine expressly, the States responded to the substance of these arguments, ROA.192-194, 196-200 (Stay Reply 1-3, 5-9); and the district court addressed them in the context of evaluating irreparable harm, ROA.222-227 (Opinion 19-24).

(noting that Texas's CHIP program excludes gender-affirming surgical and hormone treatment for minors, and Texas Medicaid excludes "sex change operations" (alteration and quotation marks omitted)); ROA.52 (Stay Motion 5) (explaining that Montana's Medicaid and CHIP programs are prohibited from covering gender-affirming surgical and hormone treatment for minors).  But to determine whether the exclusion of coverage for gender-affirming care in the States' own health programs actually violates the Rule requires significant further factual development.  And the States' feared loss of funding for violating the Rule is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all."  *Thomas*, 473 U.S. at 580-81 (quotation marks omitted).  Accordingly, this challenge is unripe.

As the Rule makes clear, it "does not impose a categorical requirement that covered entities must provide gender-affirming care."  89 Fed. Reg. at 37,596.  Nor does it "specify whether certain benefit design practices are per se discriminatory."  *Id.* at 37,614.  Instead, the Rule provides that healthcare providers and insurers can decline to provide or cover health services where they have a "legitimate, nondiscriminatory reason for denying or limiting" provision or coverage of "that service" and the determination or coverage denial is not "based on unlawful animus or bias," and does not "constitute a pretext for discrimination."  45 C.F.R. §§ 92.206(c), 92.207(c).  This includes circumstances where the covered provider "reasonably determines that such health service is not clinically appropriate for a particular individual," *id.* § 92.206(c), or where the covered insurer employs "reasonable medical management techniques such

28

as medical necessity requirements," *id.* § 92.207(c). Where a "medical necessity determination" to deny coverage constitutes a "bona fide medical judgment," it would not amount to impermissible discrimination under the Rule. *See* 89 Fed. Reg. at 37,613.

The Rule thus draws a careful line between denying gender-affirming care as the result of reasonable medical determinations—which is permissible—and denying such care as the result of animus—which is not. And in policing that line, as the Rule explains, the determination by OCR "of whether a challenged action is discriminatory is necessarily a fact-specific, case-by-case analysis dependent on the facts of the particular situation." 89 Fed. Reg. at 37,616. Providers and insurers thus have the opportunity "to articulate a legitimate, nondiscriminatory justification for an alleged discriminatory action, which OCR will scrutinize to ensure it is not a pretext for discrimination." *Id.*

The States do not allege that HHS has engaged in this fact-specific, case-by-case analysis under the Rule with respect to any of the States' health programs and their approach to the provision or coverage of gender-affirming care. Nor do they allege that HHS has even initiated the extensive administrative process that would need to precede any suspension of federal funding for violating the Rule. HHS's enforcement under Section 1557 through OCR is typically a complaint-driven process, though OCR also has authority to initiate investigations on its own. *See* 45 C.F.R. § 80.7; *see also id.* §§ 86.71, 92.5(a). As part of an investigation, OCR considers all "factors relevant to a determination as to whether the recipient has failed to comply" with Section 1557's

requirements, *id.* § 80.7(c), including any bona fide medical judgments regarding the medical necessity of treatment. If an investigation finds a "failure to comply," OCR must attempt to secure voluntary compliance through informal means. *Id.* § 80.7(d)(1). If such efforts fail, OCR makes a written finding that the recipient is in violation of the requirements of Section 1557 and makes further attempts at voluntary resolution. *Id.* § 80.8(d). If these prove unsuccessful, OCR can either refer the matter to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce Section 1557's requirements or begin administrative proceedings to suspend or terminate federal financial assistance. *Id.* § 80.8(a), (c). To terminate federal funding, specifically, OCR must conduct a formal administrative hearing and provide 30 days' advance notice to the relevant congressional committees, including "a full written report of the circumstances and the grounds for such action." *Id.* § 80.8(c); *see id.* § 80.9 (hearing requirements). A final decision to suspend or terminate funding resulting from these administrative proceedings is subject to judicial review. *Id.* § 80.11; *see* 20 U.S.C. § 1683 (incorporated by 42 U.S.C. § 18116(a)).

The district court opined that because the States "will not provide 'gender-affirming' care through their State-run Medicaid and CHIP programs," the "States' loss of federal funds is a matter of when, not if." ROA.224 (Opinion 21). But as explained, the mere refusal to provide or cover gender-affirming medical care does not violate the Rule, so long as that determination is not "based on unlawful animus or bias," and does not "constitute a pretext for discrimination." 45 C.F.R. §§ 92.206(c), 92.207(c). And

any future enforcement action against the States is far from certain. On the basis of the States' allegations, it is entirely speculative at this point whether OCR will initiate any investigation under the Rule into the handling of gender-affirming care in the States' health programs, what the States' asserted justifications would be for their policies, whether OCR would find that any such justification was actually a pretext for discrimination and that the programs were in violation of the Rule, and whether efforts at informal, voluntary compliance would be unsuccessful. Then, and only then, would the States potentially be subject to an enforcement action by the federal government for violating the Rule. *See* ROA.197 (Stay Reply 6) (asserting harm from "risk" of losing "billions of dollars in federal funds" due to noncompliance). Because these "contingent future events … may not occur as anticipated, or indeed may not occur at all," the States' challenge is premature. *Thomas*, 473 U.S. at 580-81 (quotation marks omitted); *see United Transp. Union v. Foster*, 205 F.3d 851, 858 (5th Cir. 2000) (finding claims unripe where "train of events [that] would necessarily have to occur" was based on "conjecture and speculation").

Postponing any judicial review until after HHS has pursued this administrative process, when the States' feared harms of losing federal funding become more than merely speculative, would cause no hardship. "[M]ere uncertainty" does not "constitute[] a hardship for purposes of the ripeness analysis." *National Park*, 538 U.S. at 811. In the event OCR ever does initiate an investigation into their healthcare programs for violating the Rule, the States would have the ability to raise their

arguments in that administrative proceeding and subsequent judicial review. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30, 733-34 (1998) (holding that case was not ripe where the plaintiff "will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," and noting that there would be an administrative process before plaintiffs would face any "practical harm").

**2.** Nor do the States' feared sovereign harms render their challenge ripe. To the extent this injury is premised on the States being required to violate the "exclu[sions of]" certain gender-affirming "treatments [in] their Medicaid and CHIP programs," ROA.225 (Opinion 22), it does not justify immediate judicial intervention for the reasons discussed above. The court also observed that "if HHS forced Texas and Montana to comply with the [Rule]," the States would suffer injury in the form of being "precluded from enforcing" state laws "generally bar[ring] healthcare providers from providing … 'gender-affirming' treatments and surgeries on minors." ROA.225 (Opinion 22). And the court noted a statement in the Rule's preamble that "[S]ection 1557's nondiscrimination requirements … generally preempt conflicting State law." 89 Fed. Reg. at 37,598; *see* ROA.226 (Opinion 23).

As discussed, however, the Rule does not mandate "a specific standard of care or course of treatment for any individual," 89 Fed. Reg. at 37,595, or purport to disrupt determinations against providing gender-affirming care that are based on "legitimate nondiscriminatory reason[s]," *id.* at 35,597, such as "bona fide medical judgment[s]," *id.* at 37,613; *see* 45 C.F.R. §§ 92.206(c), 92.207(c). And HHS has not engaged in any

fact-specific, case-by-case analysis required to determine that the denial of any gender-affirming care pursuant to the state laws in question would necessarily be impermissibly discriminatory under the Rule, as necessary to conclude that the relevant state laws would be preempted. Nor do the States claim that their laws are in fact based on animus rather than nondiscriminatory medical judgments. *See* ROA.33, 35 (Complaint ¶¶ 131, 138) (asserting that Texas and Montana are "attempting to protect [their] citizens from harmful medical procedures"); *see also* ROA.8 (Complaint ¶ 1); ROA.48, 52 (Stay Motion 1, 5). Accordingly, it is wholly conjectural for the States to assert at this stage that HHS would find an actual conflict between the Rule and these state laws; and absent such a conflict, the States cannot demonstrate that the Rule hinders the enforcement of their laws.

Moreover, the States have not established that they would cease enforcing the state laws in the absence of a stay. To the contrary, the States have represented that they "refuse to comply with the [Rule]" notwithstanding any "conflicts with state law." ROA.199 (Stay Reply 8); *see* ROA.224 (Opinion 21) (relying on this representation).[8] The States thus have not demonstrated that they suffer any immediate practical harm to their sovereignty from the bare promulgation of the Rule. And the mere "uncertainty" regarding whether state laws might someday be found to conflict with

---

[8] Montana cannot currently enforce its ban on such care in any event, however, because the law has been preliminarily enjoined in state court. *See* Order, *Van Garderen v. State*, No. DV 2023-541 (Mont. 4th Jud. Dict. Ct. Sept. 27, 2023), *appeal docketed*, No. DA 23-0572 (Mont. Sept. 27, 2023) (awaiting decision).

the Rule does not suffice. *See National Park*, 538 U.S. at 811. In the event that a hypothetical covered provider does someday violate one of these state laws, and invokes the Section 1557 Rule and federal preemption as a defense to a state enforcement action, the States will have the ability to fully vindicate their sovereign interests and raise their arguments in the course of those proceedings.

\* \* \*

The district court thus erred in permitting the States to prematurely obtain judicial review of their APA challenge premised on the speculative and contingent fears that they will lose federal funding for their state-run health programs or be hindered in their enforcement of state law.

## II.    At a Minimum, the Stay Is Overbroad.

### A.    The scope of relief was broader than necessary to address the States' asserted harms regarding gender-affirming care.

The district court erred in staying the Rule as to certain challenged provisions because the breadth of this relief was not necessary to remedy the States' asserted injuries and thus violates the traditional principle that equitable relief should be no "more burdensome to the defendant than necessary" to redress the plaintiffs' injuries. *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 927 (2024) (Gorsuch, J., concurring in the grant of stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

By attacking HHS's understanding of the scope of discrimination "on the basis of sex"—as expressly reflected in § 92.101(a)(2)(iv)—the States claim that they can

34

"discriminate against a person for being … transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660.  On the States' view, it would be perfectly lawful under Title IX and Section 1557 for them to punish transgender patients "simply for being … transgender," *id.* at 651, by, for example, barring them from receiving treatment for a broken arm.  The States have never suggested they wish to engage in such plainly discriminatory conduct or that they would be harmed by being required to refrain from it.  Rather, they only claim harms related to the coverage and provision of gender-affirming medical treatment.

In granting their request for a § 705 stay, the district court described the States' challenge as focused specifically on gender-affirming medical care.  *See, e.g.*, ROA.213 (Opinion 10) ("Th[e States] contend that neither Section 1557 … nor Title IX authorizes HHS to require the performance of "'gender-affirming" medical activities as a condition of receiving federal funds.'").  And the court tied its finding of irreparable harm to the provision and coverage of gender-affirming medical care.  *See* ROA.224 (Opinion 21) (explaining that States risk loss of funding because they "will not provide 'gender-affirming' care through their State-run Medicaid and CHIP programs"); ROA.225 (Opinion 22) (explaining that States would be injured by being forced to "violat[e] their own laws" that "generally bar healthcare providers from providing so-called 'gender-affirming' treatments and surgeries on minors" and being "precluded from enforcing those laws against others").  This was consistent with how the States explained their feared irreparable harms.  *See* ROA.51-52, 61 (Stay Motion 4-5, 14)

(discussing state laws barring, and state health programs excluding coverage for, gender-affirming care); ROA.197-198 (Stay Reply 6-7); *see also* ROA.192 (Stay Reply 1) ("[T]he [Rule] will require all States and healthcare providers to perform gender-transition procedures on pain of losing all federal funding.").

Even assuming that some relief were appropriate here, the specific irreparable harms alleged by the States and found by the district court could thus be remedied by staying the effective date of the Rule only insofar as the Rule's provisions would require the coverage or provision of gender-affirming medical treatments. With respect to the substantive scope of relief, there would be no need for the district court to stay the Rule more broadly.

Instead of adopting that reasonable limitation—as urged by the federal government below, ROA.244-252—the district court stayed a number of provisions of the Rule in their entirety, without regard to whether they were limited to gender-affirming medical care. As a result, some of the stayed provisions pertain to the prohibition on gender-identity discrimination generally. *See* 45 C.F.R. § 92.206(b)(1)-(2) ("sex assigned at birth, gender identity, or gender otherwise recorded"); *id.* § 92.207(b)(3) (same). Other stayed provisions are not limited to gender-identity discrimination at all, but rather relate more broadly to the overall prohibition on sex discrimination. *See id.* § 92.101(a)(2) ("Discrimination on the basis of sex includes, but is not limited to, discrimination on the basis of: (i) Sex characteristics, including intersex traits; (ii) Pregnancy or related conditions; (iii) Sexual orientation; (iv) Gender identity;

and (v) Sex stereotypes."); *id.* § 92.206(b)(3) ("treating individuals differently or separating them on the basis of sex"). And the stayed provisions of the CMS regulations, in particular, extend beyond sex to cover nondiscrimination and access to services on other grounds, such as race and disability. *See* 42 C.F.R. § 438.3(d)(4) ("race; color; national origin; disability; or sex"); *id.* § 438.206(c)(2) ("limited English proficiency and diverse cultural and ethnic backgrounds, disabilities, and … sex"); *id.* § 440.262 ("limited English proficiency, diverse cultural and ethnic backgrounds, disabilities, and … sex"); *id.* § 460.98(b)(3) ("race, ethnicity, national origin, religion, sex … , age, mental or physical disability, or source of payment"); *id.* § 460.112(a) ("race, ethnicity, national origin, religion, sex … , age, mental or physical disability, or source of payment").

The substantive scope of relief ordered by the district court is thus significantly broader than necessary to remedy the States' asserted harms. In particular, § 92.101(a)(2), which the court stayed in its entirety, is the provision that describes the scope of all prohibited sex discrimination under Section 1557. The States' stay request focused on the Rule's "[]interpret[ation of] Title IX's prohibition of discrimination 'on the basis of sex' to include discrimination on the basis of 'gender identity,'" (as provided in § 92.101(a)(2)(iv)). *See* ROA.48 (Stay Motion 1). The stay motion did not even mention three other forms of sex discrimination included in § 92.101(a)(2)(i), (ii), (v)—pregnancy, sex characteristics, and sex stereotypes—much less argue why the Rule was invalid as to those forms of discrimination. *See Career Colls. & Sch. of Tex. v. U.S. Dep't*

*of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (observing that "relief should only involve postponing the effective date of the portions of the Rule that [a plaintiff] *actually challenges* and for which it has shown a likelihood of success on the merits"). And the States did not attempt to demonstrate irreparable harm as to any form of sex discrimination beyond gender-identity discrimination.[9]

The district court thus abused its discretion in granting extensive stay relief against the Rule—as it applies generally to discrimination on the basis of gender identity, to the broader prohibition on other forms of sex discrimination, and beyond sex discrimination to other prohibited grounds of discrimination—rather than tailoring relief more narrowly to focus on the States' asserted harm: the provision or coverage of gender-affirming medical care.

**B.    The district court abused its discretion in granting nationwide relief.**

**1.**    Under Article III and fundamental equitable principles, the district court also should have limited the geographic scope of any relief to the named plaintiffs in this case. Under Article III, "a plaintiff's remedy must be limited to the inadequacy that produced his injury." *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration and quotation

---

[9] The conclusion of the States' stay motion asked the district court to "postpone the [Rule]'s effective date, and enjoin Defendants from enforcing it and from interpreting Section 1557 as prohibiting discrimination based on *sexual orientation or gender identity*." ROA.62 (Stay Motion 15) (emphasis added). But the States did not attempt to demonstrate, and the court did not find, any irreparable harm related to the Rule's prohibition on sexual-orientation discrimination.

marks omitted).  Principles of equity reinforce that constitutional limitation, because equitable relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702.  Thus, English and early American "courts of equity" typically "did not provide relief beyond the parties to the case." *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring).

Nationwide relief—whether styled as an injunction or a stay—also creates well-catalogued legal and practical problems.  Such relief circumvents the procedural rules governing class actions, which permit relief to absent parties only if rigorous safeguards are satisfied.  Fed. R. Civ. P. 23.  It enables forum shopping and empowers a single district judge to effectively nullify the decisions of all other lower courts by barring application of a challenged policy in any district nationwide.  *Department of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring in the grant of stay).  And it "short-circuit[s] the decisionmaking benefits of having different courts weigh in on vexing questions of law" and overburdens courts' "emergency dockets."  *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also United States v. Texas*, 599 U.S. 670, 702-04 (2023) (Gorsuch, J., concurring in the judgment).

In line with those principles, the Supreme Court recently stayed a universal injunction based on five Justices' explicit conclusion that such injunctions are likely impermissible.  *Poe*, 144 S. Ct. at 927 (Gorsuch, J., concurring in the grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).  And on a separate occasion, three Justices recently admonished that "universal relief … strains our

separation of powers" and advised that if "party-specific relief can adequately protect the plaintiff's interests," then "an appellate court should not hesitate to hold that broader relief is an abuse of discretion." *Texas*, 599 U.S. at 703 (Gorsuch, J., concurring in the judgment). This Court has also recognized that universal "injunctions are not 'required or even the norm,' and several justices on the Supreme Court have viewed them with conspicuous skepticism," along with "[s]cholars and judges from our sister circuits." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 953-54 (5th Cir. 2024) (footnote omitted) (quoting *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam)).

**2.**     Accordingly, another district court considering a challenge to the Section 1557 Rule rejected a request for nationwide relief. *See Florida v. HHS*, __F. Supp. 3d__, No. 8:24-cv-1080-WFJ-TGW, 2024 WL 3537510, at *20 (M.D. Fla. July 3, 2024) ("A nationwide injunction issuing from a District Court ought to be the rare exception, not routine."). Similarly here, those Article III and equitable principles required limiting any relief to the two plaintiff States in this action.

The district court initially applied those principles correctly in issuing its § 705 stay. The court recognized that courts "should generally not impose relief that is 'more burdensome to the defendant than necessary' to redress the plaintiff's injuries," ROA.229 (Opinion 26) (quoting *Poe*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay)), and noted that 5 U.S.C. § 705 provided "considerable discretion in crafting relief," ROA.229 (Opinion 26). And the court observed that "Texas and Montana have demonstrated injuries that they and covered providers in these two States

are likely to suffer," but "[t]here is no evidence of potential imminent harm to other parties." ROA.229 (Opinion 26). Accordingly, the court limited its § 705 "to all covered entities within Texas and Montana," which it determined would "accord[] with the record" and adequately "preserve these States' and their citizens' rights while fully insulating them from harm." ROA.229 (Opinion 26) (citing *Braidwood*, 104 F.4th at 954-55; *Louisiana*, 20 F.4th at 264.

**3.** At the States' subsequent request for clarification, however, the district court reversed course. The States asked the court "to expand the stay of the [Rule]'s effective date nationwide," ROA.348, and the court agreed. The court noted that "'[n]othing in the text of Section 705, nor of Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited' to the parties before the Court." ROA.348 (alteration in original) (quoting *Career Colls.*, 98 F.4th at 255). Rather, the court stated that relief under 5 U.S.C. § 705 aligns with relief under 5 U.S.C. § 706, and "the ordinary result" under § 706 "is that the rules are vacated." ROA.348 (quoting *Career Colls.*, 98 F.4th at 255). The court thus concluded that the challenged provisions of the Rule are "unlawful as to all participants, not just the [States] in this case," and "because relief under § 705 should not be party restricted, the appropriate remedy is to stay the effective date of the [Rule] for all participants." ROA.349.

To the extent the district court was suggesting that a stay under § 705 must always be nationwide, that is incorrect. Even assuming that § 705 permits universal relief in some cases, there is no basis to conclude that it authorizes *only* universal relief. The

Supreme Court recently instructed that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024).  In *Starbucks*, the Supreme Court explained that it did "not understand the statutory directive [before it] to grant relief when the district court 'deems' it 'just and proper' to jettison the normal equitable rules." *Id.*

The reasoning in *Starbucks* applies with equal force to § 705.  By providing that a reviewing court, "to the extent necessary to prevent irreparable injury," "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings," § 705 explicitly incorporates traditional equitable principles.  5 U.S.C. § 705; *see Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 241-42 (5th Cir. 2023) (explaining that the "preliminary-injunction factors apply" to "a stay under 5 U.S.C. § 705," which "has the practical effect of an injunction"), *rev'd on other grounds*, 602 U.S. 367 (2024).  And one such principle of "equity jurisprudence," as discussed above, is that any court-ordered relief "should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano*, 442 U.S. at 702 (emphasis added); *see Louisiana*, 20 F.4th at 263 (noting that nationwide injunctions are not "required or even the norm").  The House Report that accompanied the APA thus explained that the relief authorized by § 705 "is equitable" and "would normally, if not always, be limited to the parties complainant." H.R. Rep. No. 79-1980, at 43 (1946).

Even assuming that "preliminary relief under Section 705" need not be "party-restricted," ROA.348 (quoting *Career Colls.*, 98 F.4th at 255), that proposition by no means requires that § 705 relief must always be universal, *i.e.*, that § 705 forbids relief limited to the parties before the court.[10] To the contrary, courts can grant party-specific preliminary relief in APA cases. *See Florida*, 2024 WL 3537510, at *20 (limiting preliminary injunction and § 705 stay to state of Florida); *Ryan LLC v. FTC*, __F. Supp. 3d__, No. 3:24-cv-00986-E, 2024 WL 3297524, at *16 (N.D. Tex. July 3, 2024) (limiting preliminary injunction and § 705 stay to the plaintiffs). And the district court's initial decision to do so here was well within its discretion. *See* ROA.229 (Opinion 26) ("The permissive language of § 705 grants [courts] considerable discretion in crafting relief.").

In reversing course and expanding the § 705 stay to apply nationwide—notwithstanding its recognition that a stay limited to the two plaintiff States "will preserve these States' and their citizens' rights while fully insulating them from harm," ROA.229 (Opinion 26)—the district court entered relief much broader than necessary to remedy the States' asserted injuries. In doing so, the court thus abused its discretion.

---

[10] The proposition that relief under § 705 of the APA need not be party-specific hinges on the assumption that 5 U.S.C. § 706 authorizes courts to vacate agency rules, and that such vacatur has universal effect. *See Career Colls.*, 98 F.4th at 255. It is the federal government's view, however, that the APA does not authorize universal vacatur at all. *Accord Texas*, 599 U.S. at 693-99 (Gorsuch, J., concurring in the judgment); *see VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (suggesting rules may be vacated in part), *cert. granted*, 144 S. Ct. 1390 (2024).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's § 705 stay.

Alternatively, this Court should narrow the scope of stay relief to the two plaintiff States

and to their specific asserted injuries related to gender-affirming medical care.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

CHARLES W. SCARBOROUGH

*/s/ McKaye L. Neumeister*
McKAYE L. NEUMEISTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7231*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8100*
*McKaye.L.Neumeister@usdoj.gov*

November 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,495 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ McKaye L. Neumeister*
McKaye L. Neumeister

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 18116 ...................................................................................................A1

20 U.S.C. § 1681 ......................................................................................................A1

5 U.S.C. § 705.........................................................................................................A2

## 42 U.S.C. § 18116

### § 18116. Nondiscrimination

### (a) In general

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

### (b) Continued application of laws

Nothing in this title (or an amendment made by this title) shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), section 794 of Title 29, or the Age Discrimination Act of 1975, or to supersede State laws that provide additional protections against discrimination on any basis described in subsection (a).

### (c) Regulations

The Secretary may promulgate regulations to implement this section.


## 20 U.S.C. § 1681

### § 1681. Sex

### (a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

**\* \* \* \***

**5 U.S.C. § 705**

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.