# In the United States Court of Appeals for the Fifth Circuit

State of Texas; State of Montana,
*Plaintiffs - Appellees*

v.

Robert F. Kennedy, Jr., Secretary, U.S. Department of Health and Human Services; Melanie Fontes Rainer, Director; Centers for Medicare and Medicaid Services; United States Department of Health and Human Services,
*Defendants - Appellants*

On Appeal from the United States District Court
for the Eastern District of Texas, Tyler Division

## BRIEF FOR APPELLEE STATE OF TEXAS AND STATE OF MONTANA

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

JACOB C. BEACH
Assistant Solicitor General

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation
Kathleen.Hunker@oag.texas.gov

MARK A. CSOROS
Assistant Attorney General

Counsel for Plaintiffs-Appellees

# CERTIFICATE OF INTERESTED PERSONS

No. 24-50826

Under the fourth sentence of Fifth Circuit Rule 28.2.1, plaintiffs-appellees, as governmental parties, need not furnish a certificate of interested persons.

*/s/ Kathleen T. Hunker*

KATHLEEN T. HUNKER
Counsel for Plaintiffs-Appellees

## Statement Regarding Oral Argument

Plaintiff States Texas and Montana believe that this case is moot and no longer presenting a live controversy in need of resolution. Accordingly, Plaintiff States request that this Court dispose of this case on the pleadings. However, if this Court determines that any live controversy remains, Plaintiff States believe that oral argument would assist the Court in resolving this matter and would request to participate.

# Table of Contents

Page

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument ..................................................ii

Table of Authorities .....................................................................................v

Introduction.................................................................................................. 1

Statement of Jurisdiction ..........................................................................3

Issues Presented .........................................................................................3

Statement of the Case ................................................................................4

Summary of the Argument........................................................................ 11

Standard of Review ................................................................................... 15

Argument...................................................................................................... 16

    I.   This Case is Moot....................................................................... 16

        A.  There must be an "actual controversy" to support subject matter jurisdiction................................................................ 16

        B.  There is no "actual controversy" between the parties. ..................... 18

        C.  The Plaintiff States' challenge was ripe............................20

    II.  The States are Likely to Prevail on the Merits of the Claims....................23

        A.  The Previous Administration resorts to obfuscation.........................23

        B.  The Final Rule is unlawful. .................................................27

        C.  The Previous Administration lacks authority to implement the challenged provisions of the Final Rule. .....................................32

    III.  The Relief Ordered by the Court was Proper. ......................... 37

        A.  The scope of relief ordered by the district court was necessary to address the States' asserted harms regarding gender-affirming care. ...................................................... 37

        B.  The district court did not abuse its discretion in granting nationwide relief...............................................................40

Conclusion ........................................................................................................ 44

Certificate of Service ....................................................................................... 46

Certificate of Compliance ............................................................................... 46

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) ........................................................ 12, 13, 20, 23

*Adams v. Sch. Bd. of St. Johns Cnty.*,
57 F.4th 791 (11th Cir. 2022) (en banc) ................................... 25, 29

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
78 F.4th 210 (5th Cir. 2023), *rev'd on other grounds*,
602 U.S. 367 (2024) ................................................................. 15, 42

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ........................................................................ 16

*Balt. v. Azar*,
439 F. Supp. 3d 591 (D. Md.), *aff'd,* 973 F.3d 258 (4th Cir. 2020) ................ 39

*Bd. of Trs. of Glazing Health & Welfare v. Chambers*,
941 F.3d 1195 (9th Cir. 2019) ................................................... 11, 19

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ................................................................. 33

*Blanchette v. Conn. Gen. Ins. Corps.*,
419 U.S. 102 (1974) ..................................................................... 20

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ................................................................ passim

*Braidwood Mgmt., Inc. v. Becerra*,
No. 23-10326, 2024 WL 3079340 (5th Cir. June 21, 2024) ........................... 41

*California v. Texas*,
593 U. S. 659 (2021) ..................................................................... 17

*Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*,
98 F.4th 220 (5th Cir. 2024) ................................ 15, 40, 41, 42, 43, 41

*Ctr. for Individual Freedom v. Carmouche*,
    449 F.3d 655 (5th Cir. 2006) ...............................11, 17, 19

*Data Mktg. P'ship v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) .................................... 42

*DeOtte v. Nevada*,
    20 F.4th 1055 (5th Cir. 2021) ..............................11, 17, 19

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019), *cert. granted in part sub nom.*
    Dep't of ED. v. Career Colleges & Sch. of TX,
    No. 24-413, 2025 WL 65914 (U.S. Jan. 10, 2025) ..................... 12, 20

*DM Arbor Ct., Ltd. v. City of Houston*,
    988 F.3d 215 (5th Cir. 2021) .................................... 12, 21

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..............................................34

*Fischer v. United States*,
    603 U.S. 480 (Jun. 28, 2024)..................................... 28

*Florida v. Weinberger*,
    492 F.2d 488 (5th Cir. 1974) ....................................23

*Freedom From Religion Found., Inc. v. Abbott*,
    58 F.4th 824 (5th Cir. 2023)................................... 16, 17, 19

*Griffin v. HM Florida-ORL, LLC*,
    144 S. Ct. 1 (2023) (Kavanaugh, J., concurring in denial of stay) ................... 41

*Hinkley v. Envoy Air, Inc.*,
    968 F.3d 544 (5th Cir. 2020) ................................... 16

*In re Clarke*,
    94 F.4th 502 (5th Cir. 2024) ................................... 41

*K.P. v. LeBlanc*,
    729 F.3d 427 (5th Cir. 2013)................................... 16

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020)................................ 41

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................................... 31

*Louisiana by & through Murrill v. United States Dep't of Educ.*,
No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) ............................. 40

*Louisiana v. U.S. Dep't of Educ.*,
737 F. Supp. 3d 377 (W.D. La. 2024).................................. 33

*Mayfield v. United States Dep't of Lab.*,
117 F.4th 611 (5th Cir. 2024) ...................................... 14, 31, 33

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ....................................... 43

*Moore v. Harper*,
600 U.S. 1 (2023) ....................................... 17

*Murthy v. Missouri*,
603 U.S. 43 (2024) ....................................... 40

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ....................................... 15, 35

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) ....................................... 12, 20, 21

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356, (2023) ....................................... 31

*Neese v. Becerra*,
640 F. Supp. 3d 668 (N.D. Tex. 2022), *vacated and remanded on other grounds*, 123 F.4th 751 (5th Cir. 2024) ............................... 30

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................... 42, 43

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012)....................................... 21

*Pelcha v. MW Bancorp, Inc.*,
988 F.3d 318 (6th Cir. 2021)....................................... 28

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ........................................... 14, 35

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ........................................... 31

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................... 14, 35

*Starbucks Corp. v. McKinney*,
    144 S. Ct. 1570 (2024) ........................................ 42

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................ 41

*Suitum v. Tahoe Reg'l Plan. Agency*,
    520 U.S. 725 (1997) ........................................... 13, 22

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
    110 F.4th 762 (5th Cir. 2024) .............................. 41

*Texas v. Cardona*,
    743 F. Supp. 3d 824 (N.D. Tex. 2024) ............... 28, 31, 35

*Texas v. United States Dep't of Transp.*,
    726 F. Supp. 3d 695 (N.D. Tex. 2024) ............... 42, 43

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) .............................. 43

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) .............................. 12, 21

*Texas v. United States*,
    691 F. Supp. 3d 763 (S.D. Tex. 2023), *aff'd in part, modified in part*,
    126 F.4th 392 (5th Cir. 2025) ............................ 39

*United States v. Abbott*,
    110 F.4th 700 (5th Cir. 2024) ............................ 16

*Util. Air Regul. Grp. v. E.P.A.*,
    573 U.S. 302 (2014) ........................................... 34

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
    692 F. Supp. 3d 616 (N.D. Tex.), *vacated sub nom.*
    *Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023) ........................... 42

*Wages & White Lion Investments, LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) .................................................................43

*West Virginia v. Dep't of Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ...................................................................35

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...........................................................................14, 32, 33

*Yarls v. Bunton*,
    905 F.3d 905 (5th Cir. 2018) ...................................................................16

## Constitutional Provisions & Statutes

U.S. Const. art I, § 8, cl. 1 .............................................................................34

5 U.S.C. § 705.................................................................................. 15, 43

5 U.S.C. § 706(2)(A) ...................................................................... 12, 20

20 U.S.C. § 1681(a)............................................................................... 4

20 U.S.C. § 1686....................................................................................25

28 U.S.C. § 1292(a)(1) ...........................................................................3

29 U.S.C. § 705(20)(E) ...........................................................................5

29 U.S.C. § 705(20)(F)(i) ........................................................................5

42 U.S.C. § 1396a(a)(4) ........................................................................33

42 U.S.C. § 1396a(a)(19) .......................................................................33

42 U.S.C. § 1397aa(a) ...........................................................................33

42 U.S.C. § 18116....................................................................................5

42 U.S.C. § 18116(a) ..........................................................................4, 5

42 U.S.C. § 18116(c) ........................................................................31, 34

## Rules & Regulations

42 C.F.R. § 92.2(c) ........................................................................ 2

42 C.F.R. § 92.206(b)(4) ............................................................... 2

42 C.F.R. § 438.3(d)(4) ................................................................10

42 C.F.R. § 438.206(c)(2) .............................................................10

42 C.F.R. § 440.262 ......................................................................10

42 C.F.R. § 460.98(b)(3) ...............................................................10

42 C.F.R. § 460.112(a) ..................................................................10

45 C.F.R. § 92.101(a)(2)(iv) ..........................................................10

45 C.F.R. § 92.206(b)(1)-(4) ..........................................................10

45 C.F.R. § 92.206(c) ...................................................................26

45 C.F.R. § 92.207(b)(3)-(5) ..........................................................10

89 Fed. Reg. 37,522 .................................................................. 1, 5

89 Fed. Reg. 37,535 ................................................................. 2, 26

89 Fed. Reg. 37,593 ............................................................ 2, 24, 25

89 Fed. Reg. 37,613 ......................................................................26

89 Fed. Reg. 37,668 ................................................................ 33, 34

89 Fed. Reg. 37,671 ........................................................................1

89 Fed. Reg. 37,693 ................................................................. 2, 26

89 Fed. Reg. 37,699 ......................................................................37

89 Fed. Reg. 37,701 ............................................................ 2, 25, 26

90 Fed. Reg. 8,615 ..................................................................passim

90 Fed. Reg. 8,771 ................................................................... 8, 19

## Other Authorities

Black's Law Dictionary 1413 (6th ed. 1990) ......................................... 42

Jonathan F. Mitchell,
    104 Va. L. Rev. 933 (2018) ................................................................ 41

Mila Sohoni, The Power to Vacate a Rule,
    88 Geo. Wash. L. Rev. 1121 (2020) ................................................. 41

Pub. L. No. 111-148, 124 Stat. 119 ......................................................... 4

# Introduction

For his entire term as President of the United States, Joe Biden viewed himself as a generational, transformational President, as opposed to one who was held hostage by radical ideals. In no sphere was this more evident than that of gender and gender identity as it related to federal law. Time and again, the Biden Administration sought to push woke gender ideology on the American people by reinterpreting nondiscrimination laws, only to be met with overwhelming resistance by both the public and the courts. *See*, *e.g.*, ROA.206-07. Undeterred by failure, the United States Department of Health and Human Services under the previous presidential administration published a new rule on May 6, 2024, *Nondiscrimination in Health Programs and Activities*, 89 Fed. Reg. 37,522 (Final Rule), purporting to "clarify the scope of sex discrimination" under Section 1557 of the Affordable Care Act (ACA). *See* 89 Fed. Reg. 37,671. Citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Final Rule reinterprets Title IX's prohibition of discrimination "on the basis of sex" to include discrimination on the basis of "sexual orientation" and "gender identity." Neither Section 1557 nor Title IX permits the Previous Administration to promulgate this sweeping new rule.

In defending the Final Rule, the Previous Administration attempts a sleight-of-hand wherein they argue, among other things, that the nondiscrimination provision prevents transgender identifying individuals from being denied medical care, such as treatment for a broken arm. Appellants' Br. at 6, 22. But this assertion, of course, hides the ball. The Final Rule does not mention broken bones or other ordinary health services. Nor did the Previous Administration establish in the Final Rule that

transgender patients were at risk of being denied such care. Instead, the Final Rule refers to "gender affirming" and "gender transition" services over 100 times, and it *codifies* a right to them. No health programs, "*any part of which is receiving Federal financial assistance*," 89 Fed. Reg. 37,693 (to be codified at 42 C.F.R. § 92.2(c) (emphasis added), may "[h]ave or implement a categorical coverage exclusion or limitation for all health services related to *gender transition* or other *gender-affirming* care." 89 Fed. Reg. 37,701 (to be codified at 42 C.F.R. § 92.206(b)(4)) (emphasis added). In other words, no state or healthcare provider may refuse to pay for or perform harmful "gender transition" procedures, and any state law that prohibits these activities are preempted. 89 Fed. Reg. 37,535.

The Final Rule further imposes the Previous Administration's extreme ideology by barring covered entities, including Plaintiff States, from adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity." 89 Fed. Reg. 37701 *(*to be codified at § 92.206(b)(3)). What this means in practice is that medical providers must allow biological males who "identify" as female into female-exclusive facilities, including shared hospital rooms. *See id.* at 37593 (stating that an alternative policy "would result in more than *de minimis* harm."). It also means that, in all but extreme situations (e.g., performing a hysterectomy on a biological male who lacks a uterus), doctors must entertain a patient's preferred gender—even against the great weight of scientific evidence and logic—or risk running afoul of federal law. ROA.209. The heart of this controversy is that the Final Rule demands that Plaintiff States and medical providers ignore basic biological facts. And the Previous Administration's best

efforts amount to nothing more than a thinly veiled strawman: No one wants to prevent transgender patients from accessing health care.

Plaintiff States want to ensure that healthcare providers do not lose federal funding under the ACA for refusing to perform highly controversial and experimental gender transition procedures that cause more harm than good. The Rule's broad language purports to override and preempt all state laws to the contrary, thus forcing medical providers to actively participate in and support the transgender ideology. In the medical field, where biological sex is a necessary and important factor in diagnosis and treatment, medical providers should not be forced to indulge in fantasy by playing along with far-left gender ideology, nor should they be forced to defy reality by trying to change an individual's biological sex.

## STATEMENT OF JURISDICTION

Because this appeal is from an interlocutory order staying enforcement of a Final Rule, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

In May 2024, the U.S. Department of Health and Human Services under the previous presidential administration promulgated a Final Rule that, in relevant part, reinterpreted "discrimination on the basis of sex" under Section 1557 of the Affordable Care Act to include discrimination on the basis of "sexual orientation" and "gender identity." Plaintiff States Texas and Montana challenged the portions of the Final Rule effecting the Previous Administration's reinterpretation, and the

district court granted a nationwide stay on the challenged portions of the Final Rule. The questions presented in this appeal are:

1. Whether subsequent executive action has made this controversy moot, and

2. If not, whether the district court rightly stayed the challenged portions of the Final Rule.

## Statement of the Case

### I. Section 1557

In March 2010, Congress passed, and President Obama signed into law, the Affordable Care Act. Pub. L. No. 111-148, 124 Stat. 119. Section 1557 of the Act, upon which the Biden Administration relies, prohibits any federally funded health program from discriminating "on the grounds prohibited under . . . Title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discriminating "on the basis of sex." 20 U.S.C. § 1681(a). In short, federally funded health programs are prohibited from engaging in any practices that would treat men better than women, or vice versa. ROA.9. Section 1557 of the ACA thus incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. ROA.12. It does not add a new non-discrimination provision to the United States Code. ROA.12.

Section 1557 does not independently define the term "sex" and does not reference sexual orientation or gender identity. ROA.13. The provision specifically excludes from the scope of its nondiscrimination rule "transsexualism" and any "gender identity disorder" "not resulting from physical impairments." 42 U.S.C. §

18116(a) (prohibiting discrimination "on the ground prohibited under . . . section 794 of title 29"); 29 U.S.C. § 705(20)(F)(i) (providing that "transsexualism" and "gender identity disorders not resulting from physical impairments" are not a "disability" under section 794); see also 29 U.S.C. § 705(20)(E) (excluding "homosexuality" and "bisexuality" from protected categories).

## II.    The Final Rule

On May 6, 2024, the federal Department of Health and Human Services' Office for Civil Rights and the Centers for Medicare & Medicaid Services (collectively, "the Previous Administration") promulgated a final rule entitled Nondiscrimination in Health Programs and Activities. 89 Fed. Reg. 37,522. The Previous Administration issued this Final Rule purporting to "clarify the scope of sex discrimination" under the nondiscrimination authority granted by Section 1557, 42 U.S.C. § 18116; the result was a reinterpretation Title IX's prohibition of discrimination "on the basis of sex" to include discrimination on the basis of gender identity. *See generally* 89 Fed. Reg. 37,522.

The Final Rule requires that state policy allow, state funds pay for, and healthcare providers provide, gender transition or other "gender-affirming" care as a condition of the receipt of federal healthcare funding. Any entity, "any part of which" participates in HHS financial assistance programs, is subject in all aspects of its health programs and activities to Section 1557. 42 U.S.C. § 18116(a). States that did not comply with the Final Rule stood to lose all federal health care funds, including Medicaid and Medicare dollars.

## III.     Recent Developments

### A.     Executive Order 14168

President Donald Trump assumed office on January 20, 2025; the same day, he issued an executive order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." *See* Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025). The order states, as relevant here, that "[t]he erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system" and asserts a need to "defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male." *Id.*

The order articulates certain "polic[ies]" such as: "the policy of the United States to … (i) recognize two sexes, male and female[;]" (ii) "[t]hese sexes are not changeable and are grounded in fundamental and incontrovertible reality[;] [and] (iii) the Executive Branch will enforce all sex-protective laws to promote this reality[.]" *Id.* It then states, as relevant here, that "[t]he following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:"

- "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

- "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity.

- "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.* The order then instructs that:

- [T]he Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

- … The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock v. Clayton County* (2020) to sex-based distinctions in agency activities.

*Id.* It separately addressed "Privacy in Intimate Spaces:" which states, in part, that "Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity." *Id.* Finally, under the "implementation" heading, the order provides that:

- [C]hanges to agency documents, including regulations, guidance, forms, and communications, [must be] made to comply with this order;

- Agency-imposed requirements on federally funded entities, including contractors, [must be amended] to achieve the policy of this order[;] [and]

- The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded[.]

*Id.*

## B.      Executive Order 14187

On January 28, 2025, President Trump announced Executive Order 14187, titled "Protecting Children from Chemical and Surgical Manipulation." *See* Exec. Order No. 14,187, 90 Fed. Reg. 8,771 (Jan. 28, 2025). The order states that "it is the policy of the United States that it will not fund, sponsor, promote, assist, or support the so-called 'transition' of a child from one sex to another, and it will rigorously enforce all laws that prohibit or limit these destructive and life-altering procedures." And states that "for the purposes of this order[:]"

> The phrase "chemical and surgical mutilation" means the use of puberty blockers, including GnRH agonists and other interventions, to delay the onset or progression of normally timed puberty in an individual who does not identify as his or her sex; the use of sex hormones, such as androgen blockers, estrogen, progesterone, or testosterone, to align an individual's physical appearance with an identity that differs from his or her sex; and surgical procedures that attempt to transform an individual's physical appearance to align with an identity that differs from his or her sex or that attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions. This phrase sometimes is referred to as "gender affirming care."

*Id.* The order includes "[a]dditional [d]irectives to the [s]ecretary of HHS" which requires …. [t]he Secretary of HHS … [to] take all appropriate actions to end the chemical and surgical mutilation of children, including regulatory and sub-regulatory actions, which may involve the following laws, programs, issues, or documents:

- Medicare or Medicaid conditions of participation or conditions for coverage;
- [C]linical-abuse or inappropriate-use assessments relevant to State Medicaid programs; [and]
- *[S]ection 1557 of the Patient Protection and Affordable Care Act.*

*Id.* (emphasis added). It instructs the Secretary of HHS to "promptly withdraw HHS's March 2, 2022, guidance document titled 'HHS Notice and Guidance on Gender Affirming Care, Civil Rights and Patient Privacy.'" *Id.*

### C.     HHS Implementation

On February 19, 2025, HHS issued a press release providing guidance on the interpretation and implementation of the two executive orders. Press Release, U.S. Dep't of Health & Hum. Servs., HHS Takes Action on President Trump's Executive Orders Defending Women and Children (Feb. 19, 2025), https://www.hhs.gov/about/news/2025/02/19/hhs-takes-action-president-trumps-executive-orders-defending-women-children.html. It states that, "[a]s part of the [President's] initiative, HHS released guidance to the U.S. government, external partners, and the public to expand on the clear sex-based definitions in Executive Order 14168" and "policies protecting children from chemical and surgical mutilation, as directed by President Trump's Executive Order 14187." The guidance incorporated the definition

of "sex" identified in Executive Order 14168. *See* U.S. Dep't of Health & Hum. Servs., Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168 (Feb. 19, 2025) (defining "[s]ex" as "[a] person's immutable biological classification as either male or female").

## IV. Procedural History

On June 10, 2024, Plaintiff States Texas and Montana filed suit in the U.S. District Court for the Eastern District of Texas, challenging the Final Rule on grounds that its reinterpretation of Title IX was in fact a misinterpretation, making the Final Rule an overreach of the Previous Administration's statutory authority. ROA.8. The next day Plaintiff States filed a motion for a temporary restraining order, preliminary injunction, and stay of agency action. ROA.48.

Judge Jeremy D. Kernodle issued a Memorandum Opinion and Order on July 3, 2024, staying until further notice the effective date of the Final Rule as to Texas and Montana. ROA.204. Following the stay, Plaintiffs filed a motion for clarification on whether or not the stay was universal. ROA.232. The Previous Administration in turn filed a motion for reconsideration asking Judge Kernodle to limit the stay only to the challenged portions of the Final Rule. ROA.244. In response to these two motion, on August 30, 2024, Judge Kernodle issued an Order Modifying Stay, clarifying that the stay applied nationwide while limiting it only to those portions of the Rule that address discrimination on the basis of "gender identity" (42 C.F.R. §§ 438.3(d)(4), 438.206(c)(2), 440.262, 460.98(b)(3), 460.112(a); 45 C.F.R. §§ 92.101(a)(2)(iv), 92.206(b)(1)-(4), 92.207(b)(3)-(5)). ROA.347.

The Previous Administration filed a notice of appeal on August 30, 2024 regarding the Memorandum Opinion and Order, as well as the Order Modifying Stay. ROA.352.

<h2 style="text-align:center">Summary of the Argument</h2>

This appeal should be dismissed. The federal government has repudiated the arguments previously advanced in this dispute—including those specifically applied to Section 1557. However, should this Court proceed to the merit, this Court should affirm the lower court's ruling as Plaintiff States have shown that they have a likelihood of success on the merits and that the Previous Administration lacks authority to enact the Final Rule.

**I.** At the outset, this case is moot. The Court lacks jurisdiction where "'any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot.'" *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (quoting *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)). In this case, the federal government has reneged their position on the issues at bar in the form of two separate executive orders. As a result, the federal government now agrees that "sex" does not include "gender identity." *See* Exec. Order No. 14,168, 90 Fed. Reg. 8,615 (Jan. 20, 2025). There is thus no controversy between the Parties, and the case is moot, depriving the Court of subject matter jurisdiction. *Board of Trustees of Glazing Health & Welfare v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) ("[I]n determining whether a case is moot, we should presume that the repeal, amendment, or expiration of legislation *will* render an action challenging the legislation moot.") (emphasis added).

If this Court disagrees and decides that a live controversy exists, it should not vindicate the Previous Administration's last-ditch efforts to lift the adverse ruling from the books. Notwithstanding the Previous Administration's pleas to the contrary, Plaintiff States' challenge was ripe when the district court issued its order. "A challenge to administrative regulations is fit for review if (1) the questions presented are "purely legal one[s]," (2) the challenged regulations constitute "final agency action," and (3) further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (citing *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)). Undisputedly, the Final Rule is a final agency action, and the issues herein are purely legal and can be resolved without any additional factual findings.

That the Previous Administration has not initiated any sort of enforcement action is entirely irrelevant; a claim is ripe when it "would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 (5th Cir. 2021). "The Administrative Procedure Act embodies a 'basic presumption of judicial review' and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Com. v. New York*, 588 U.S. 752, 771 (2019) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); 5 U.S.C. § 706(2)(A)). Violation of the Final Rule necessitates withdrawal of federal funding, requiring "an immediate and significant change in the plaintiffs' conduct" such that Plaintiff

States would need to decide whether to follow its own laws or comply with the Final Rule. *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 743-44 (1997) (citing *Abbott Laboratories*, 387 U.S. at 153). Plaintiff States' challenge was ripe and the district court did not commit error by resolving it.

**II.** Plaintiffs also showed that they are likely to succeed on the merits. The Final Rule, which mandates that covered entities perform gender transition procedures and forbids sex-separated living facilities, is unlawful and outside of the Previous Administration's statutory authority to regulate, as well as being arbitrary and capricious. Despite the Previous Administration's insistence, the narrow holding in *Bostock* does not apply to the ACA's nondiscrimination provision. In *Bostock*, the Supreme Court refused to prejudge other laws outside of Title XII, and for good reason. 590 U.S. 644 at 681. Title VII relates to employment rights, and an employee's sex is generally "not relevant to the selection, evaluation, or compensation of employees." *Id.* at 660. Conversely, in the healthcare field, sex is a vital component of diagnosis, treatment, and prevention of certain health conditions. An individual's biological sex informs, to some extent, every decision that a healthcare provider makes. Congress, in the context of Title IX as it relates to the ACA, could not therefore have possibly intended to include the concept of "gender identity" in the definition of sex—thus rendering the Previous Administration's expanded definition incompatible with the ACA's nondiscrimination provision. Consequently, the district court correctly concluded that the Final Rule was unlawful.

Additionally, the Previous Administration lacked the authority to implement the Final Rule, because the Rule violates both the major questions doctrine and the

spending clause of the Constitution. The major questions doctrine requires applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue." *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022) (cleaned up). A major questions problem arises where an agency either (1) "claims the power to resolve a matter of great political significance," (2) attempts to "regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities," or (3) "seeks to intrude into an area that is the particular domain of state law." *Mayfield v. United States Dep't of Lab.*, 117 F.4th 611, 616 (5th Cir. 2024) (quoting *West Virginia v. EPA*, 597 U.S. 697, 743-44 (2022) (Gorsuch, J., concurring). The Final Rule's polarizing political nature coincided with the fact that it is inexorably tied to billions of dollars of federal funding—the loss of which would devastate Plaintiff States' healthcare systems—invokes the major questions doctrine. And where the doctrine applies, neither HHS nor any other federal agency can act absent clear congressional authorization.

Similarly, the Final Rule runs afoul of the spending clause of the United States Constitution. Though Congress holds the power of the purse, such power is "not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). When Congress seeks to tie funding to a desired action, it must "speak with a clear voice," so that States considering whether to accept certain funds under certain conditions are "cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Because Title IX is dependent on the Spending Clause and the Final Rule conditions receipt of federal healthcare funds on compliance with a reinterpretation of Title IX,

the Final Rule is subject to restrictions on spending. First, the Final Rule constitutes a surprise post-acceptance condition that forces States to implement radical gender ideology throughout their healthcare systems, in direct violation of the restrictions on the Spending Clause. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012). The Final Rule is also coercive to the point of compulsion, due to the billions of dollars of strings attached to its compliance. The Rule therefore violates the Spending Clause, and the Previous Administration had no authority to implement it.

**III.** The relief ordered by the district court was proper, both in staying the entire Final Rule, and by ordering nationwide relief. The Previous Administration did not meet its burden of showing that portions of the Final Rule should be saved. They could not rebut the fact that the Final Rule's expanded definition of discrimination on the basis of sex did not permeate the entire Final Rule and thus, the Court needed to enjoin the full Final Rule to make its stay effective. Nor did the district court did abuse its discretion in granting a nationwide stay of the Final Rule. The relief in § 705, like in § 706, is not restricted by party or by geography. *Career Colleges & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), cert. granted in part sub nom. *Dep't of ED. v. Career Colleges & Sch. of TX,* No. 24-413, 2025 WL 65914 (U.S. Jan. 10, 2025). The relief sought here is zero sum—either the Rule is in effect, or it is not, and the trial court did not abuse its discretion by granting a nationwide stay.

## Standard of Review

This Court's review of a stay entered under 5 U.S.C. § 705 proceeds as if the district court had entered a preliminary injunction. *See Alliance for Hippocratic Med.*

*v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024). Accordingly, this Court reviews the district court's stay order "for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *United States v. Abbott*, 110 F.4th 700, 708 (5th Cir. 2024) (internal citation omitted).

ARGUMENT

## I. This Case is Moot.

Through a pair of executive orders, the Federal Government repudiated the arguments previously advanced in this dispute—including those specifically applied to Section 1557. As a result, there is no live controversy between the parties, and this case is moot. The appeal should be dismissed.

### A. There must be an "actual controversy" to support subject matter jurisdiction.

"Article III restricts [this Court's] jurisdiction to cases and controversies[,]" *Freedom From Religion Found., Inc. v. Abbott*, 58 F.4th 824, 831 (5th Cir. 2023), meaning that it may "adjudicate only live disputes." *Id.* (quoting *Hinkley v. Envoy Air, Inc.*, 968 F.3d 544, 548 (5th Cir. 2020)). "[A] dispute is no longer live when 'the parties lack a legally cognizable interest in the outcome.'" *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). "In that event, the case has become moot." *Id.* Indeed, "'[t]here must be a case or controversy through all stages of a case'—not just when a suit comes into existence but throughout its existence." *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (quoting *K.P. v. LeBlanc*, 729 F.3d 427, 438 (5th Cir. 2013)). This is because "'the judicial power does not "operate on legal rules in

16

the abstract'; it operates on the rights and liabilities of contending parties with adverse legal interests." *Moore v. Harper*, 600 U.S. 1, 47 (2023) (quoting *California v. Texas*, 593 U. S. 659, 672 (2021)) (Thomas, J., dissenting). As a result, "'any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot.'" *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006)); *accord. Freedom From Religion Found.*, 58 F.4th at 832.

This Court's decision in *Freedom From Religion Foundation* provides a useful example. *See* 58 F.4th 824. There, the Foundation sought to display a "Bill of Rights" nativity scene after the State Preservation Board (i.e., the governing entity) permitted a Christian nativity scene. *Id.* at 828-29. Although initially approving the Foundation's display, the Preservation Board revoked such permission, and a lawsuit followed. *Id.* During the pendency of the litigation, the Preservation Board amended, and then altogether repealed, the rule at issue. *Id.* at 831. On appeal, this Court held that the case no longer presented a justiciable case or controversy because "the Foundation's asserted injury was tied to the existence of the Capitol Exhibit Rule," which no longer existed. *Id.* at 832. The Court reasoned that the Foundation's claim—"wrongful[] exclu[sion] from displaying its exhibit in a limited public forum"— would be remedied by ending the wrongful exclusion because "its injury necessarily parallels its requested relief." *Id.* Although "the Foundation request[ed] an injunction ordering the Defendants to display its exhibit in the forum," the Court explained that the Foundation received relief (through an end to the wrongful exclusion) because "the Board has closed the forum" altogether. *Id.*

## B. There is no "actual controversy" between the parties.

In their complaint, Plaintiff States requested a declaration that "sex" discrimination does not include "gender identity" and that *Bostock* did not apply to Title IX. ROA.35-36. It asked that the Rule be deemed "arbitrary and capricious" due to its failure to consider that "in medical practice … differences between the sexes are a biological reality." ROA.40. It pointed to the WPATH Standards as arbitrary and against evidence, *id.*, and criticized the Rule's failure to consider the significant, documented harms resulting from "gender affirming care," ROA.40-41. At end, it explained that the Rule unlawfully threatened its Medicaid or CHIP funding, resulting in an impossible choice for States: break its own state law or lose billions of dollars. ROA.37, 38-39, 41-43.

As the federal government acknowledges, the crux of this dispute is "whether the prohibition on sex discrimination in Title IX, as incorporated by Section 1557, encompasses gender-identity discrimination." Appellants' Br. at 18 n.5. The federal government claims that sex discrimination encompasses discrimination based on "sexual orientation" and "gender identity" and this "flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock*." Appellants' Br. at 2. This is in defense of a rule that aims to protect "gender-affirming care"—while using billions of dollars as a stick to force acquiescence by the States.

The Court no longer needs to reach that question, however, as the federal government now *agrees* that Title IX does *not* encompass "gender-identity discrimination." See supra pp. 6-10. In fact, the federal government has now repudiated every position that once threatened States' funding. *See* Exec. Order No. 14,168, 90 Fed.

Reg. 8,615 (Jan. 20, 2025) (acknowledging that "sex" does not include "gender identity," *Bostock* does not apply to Title IX, the difference between sexes is a biological reality, and any threat to federal funding based on a contrary interpretation is unlawful and will not be enforced); Exec. Order No. 14,187, 90 Fed. Reg. 8,771 (Jan. 28, 2025) (rejecting WPATH standards as "junk science," acknowledging the harms resulting from "gender affirming care," and prohibiting any loss of funding based on a contrary interpretation).

As a result, there is no longer a dispute: both sides agree that Section 1557 does not require states to provide "gender affirming care" or lose critical funding in the name of vindicating "discrimination." While repeal is one way to ensure mootness, it is not strictly necessary. Here, the federal government has (i) committed to repealing the policy; (ii) taken steps to do so; and (iii) prohibited enforcement of the unlawful interpretation. *See Freedom From Religion Found.*, 58 F.4th at 832 (the absence of an injury precludes a controversy because "injury necessarily parallels [the] requested relief"); *Bd. of Trs. of Glazing Health & Welfare v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) ("[I]n determining whether a case is moot, we should presume that the repeal, amendment, or expiration of legislation *will* render an action challenging the legislation moot.") (emphasis added). The question here is not if this Rule will be repealed, but when. The absence of an "actual controversy" thus precludes the need for judicial resolution. *See DeOtte*, 20 F.4th at 1064; *Carmouche*, 449 F.3d at 661; *Freedom From Religion Found.*, 58 F.4th at 832.

## C. The Plaintiff States' challenge was ripe.

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807-08 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Ripeness is "a question of timing" of the suit at bar. *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 140 (1974).

The Previous Administration argues that the States' challenge was, and continues to be, unripe because no enforcement action has been initiated against the States pursuant to the challenged Rule. Appellants' Br. at 26-34. But the fact that the Previous Administration has yet to withhold federal funding under the Rule or otherwise begun to enforce the Rule against Plaintiff States does not require the Court to determine the States' claims to be unripe. The Previous Administration ignores that "[t]he Administrative Procedure Act embodies a 'basic presumption of judicial review' and instructs reviewing courts to set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Dep't of Com. v. New York*, 588 U.S. 752, 771 (2019) (citing *Abbott Labs.*, 387 U.S. at 140; 5 U.S.C. § 706(2)(A)).

The Court should be guided by this presumption of reviewability when considering ripeness. And in evaluating the ripeness of a challenge to pre-enforcement agency action, the Court must assess "the fitness of the issues for judicial decision,"

and "the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

Here, Plaintiff States' claims were fit for judicial decision. A claim is fit for judicial decision when it "would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *DM Arbor Ct.*, 988 F.3d at 218. "A challenge to administrative regulations is fit for review if (1) the questions presented are "purely legal one[s]," (2) the challenged regulations constitute "final agency action," and (3) further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented." *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (citing *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812). The Previous Administration does not dispute that the Rule is final agency action.

Regarding the first factor, Plaintiff States' claims are purely legal challenges to the facial validity of the Final Rule. Facial challenges to an agency rule are typically ripe for review when the rule becomes final. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287-88 (5th Cir. 2012).

Regarding the third factor, the district court correctly determined that further factual development was unnecessary for it to decide the legal questions raised in this matter. Plaintiff States' claims rest on the substance of the Rule. And the text of the Rule describes a clear intent to require States to offer so-called gender-affirming care as a condition of receiving federal funding. Waiting for further factual development is unnecessary; this Court can affirm the district court on the facts in the record before it today.

The Previous Administration argues that "whether the exclusion of coverage for gender-affirming care from the States' own health programs actually violates the Rule requires significant further factual development." Appellants' Br. at 28. But no party has asked the Court to determine whether the States have violated the Rule. This is a facial challenge to the legality of a final administrative regulation, not a dispute about the particulars of a specific enforcement action. The district court correctly identified the likely effect of the Rule on the States if they fail to comply with the Rule: the loss of billions of dollars of federal funding for Medicaid and CHIP programs. ROA.223. The Court can resolve the legal issues before it without further development of the factual record, and the States' claims are fit for judicial decision.

The Previous Administration argues that the Court should deem the States' claims unripe because the States can simply raise their claims in any future enforcement proceedings. Appellants' Br. at 31. But Plaintiff States will suffer hardship if the district court's opinion is not affirmed. The district court correctly recognized that the Final Rule put Plaintiff States in the predicament of having to choose between complying with the Rule in violation of state law, which would preclude enforcement of state law against others, or refusing to comply with the Rule and jeopardizing billions of dollars in federal funding for State Medicaid and CHIP programs. ROA.223, 225.

"Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance," hardship has been demonstrated and "access to the courts ... must be permitted." *Suitum*, 520 U.S. at

743-44 (citing *Abbott Labs.*, 387 U.S. at 153). If the Court denied review, Plaintiff States would have to immediately decide whether to cease enforcing their own laws or risk losing significant amounts of federal funding. Furthermore, without the district court's stay of the Final Rule, the injury the States allege would have already occurred—the States' sovereign authority to enforce their own statutes would have been obstructed by the Rule and by the pressure from the Previous Administration to change their state laws. Plaintiff States should not have to renounce their laws or face an enforcement proceeding with billions of dollars of federal funding at stake to show hardship. The Court should not place "the sovereign state[s]…at such risk when so little would be gained by doing so and so much might be lost." *Florida v. Weinberger*, 492 F.2d 488, 493 (5th Cir. 1974).

For the foregoing reasons, the Court should affirm that the States' claims are ripe for judicial review. The harm the States allege has not occurred only because of the district court's stay, the case presents purely legal questions, and the States would suffer substantial hardship if forced to wait for enforcement proceedings to obtain their day in court. "The lines are drawn, the positions taken, and the matter is ripe for judicial review." *Id.*

## II.  The States are Likely to Prevail on the Merits of the Claims.

### A.  The Previous Administration resorts to obfuscation.

The Previous Administration's opening brief is a clinic in elision. For example, the Previous Administration minimizes distinctions between Titles VII and IX. To do so, it argues that both laws contain statutory exceptions allowing for sex

separations in certain contexts, even quoting *Bostock*'s reference to "sex-segregated bathrooms, locker rooms, and dress codes." Appellants' Br. at 25 (quoting *Bostock*, 590 U.S. at 681). What the Previous Administration omits is that the quoted language is actually *Bostock* refusing to rule on provisions with such sex separation: "Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 590 U.S. at 681. Thus, contrary to the Previous Administration's suggestion, *Bostock* does not ease tension between statutory sex separation and the Previous Administration's sweeping gender identity agenda either under Title VII or any other law.

The Previous Administration not only overstates *Bostock*, it understates the Final Rule. In addressing sex-separate facilities, the Final Rule starts reasonably enough: "Nothing in this rule prohibits a covered entity from operating sex separated programs and facilities, so long as it does not subject anyone, including transgender and nonbinary individuals, to more than de minimis harm on the basis of sex." 89 Fed. Reg. 37,593. But read on, as the Final Rule makes plain how it will balance sex-separate programs and facilities with transgender women who want to room with biological women: "A covered entity will be in violation of this rule if they refuse to admit a transgender person for care or refuse to place them in facilities consistent with their gender identity, because doing so would result in more than de minimis harm." *Id.* Thus, in sum, the Final Rule stands for the stunning proposition that *Bostock* expressly refused to endorse: separation by sex as understood by the Previous Administration's radical gender ideology is permitted; separation by biological sex is not.

This illustrates the depth of the Previous Administration's elision: their insistence that the Final Rule does not alter the definition of sex from its traditional, biological meaning simply camouflages the Final Rule's cavalier treatment of the word. Where once "sex-separate facilities" meant separating biological men from biological women, that distinction no longer exists under the Final Rule because to separate a biological female from a biological male identifying as female may cause "trauma, distress, or threats to their safety." 89 Fed. Reg. 37,593. The Final Rule skips the step of overtly re-defining "sex," but instead takes a new and expansive definition for granted. *Bostock* compels no such legerdemain. *Bostock*, 590 U.S. at 655 ("[W]e proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female."). Neither does Title IX. 20 U.S.C. § 1686; *see Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811-14 (11th Cir. 2022) (en banc).

The Final Rule further undermines the meaning of "sex" as a biological distinction by ignoring biological distinctions even in the context of medical procedures where the sex of the patient matters. It does so by allowing individual instances to create general rights:

> Nothing in [§ 92.206] requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to *any* individual or where the covered entity reasonably determines that such health service is not clinically appropriate for *a particular* individual.

89 Fed. Reg. 37,701 (emphasis added).

Thus, under the Final Rule, a refusal to pay for or perform a hysterectomy "sought for purpose of gender-transition" is an act of "unlawful animus or bias," and compliance with State laws limiting such procedures are "a pretext for discrimination." *See* ROA.141 (quoting 45 C.F.R. § 92.206(c)). Deviations from the Final Rule's new default conflation of elective and non-elective procedures require submission of "the clinical, evidence-based criteria or guidelines relied upon" to OCR. 89 Fed. Reg. 37,613. The Final Rule is clear and uncompromising: a hysterectomy to treat endometrial cancer enshrines a presumptive right to hysterectomies in pursuit of gender transition.

The Previous Administration elides this uncomfortable reality with rose-colored glasses that see only "broken arm[s]" under the Final Rule. Appellants' Br. at 6, 22, 35. The Final Rule addresses no broken bones, but instead refers to "gender-affirming" and "gender transition" services over 100 times. The Previous Administration's reassurances that the Final Rule "draws a careful line between denying gender-affirming care as the result of reasonable medical determinations—which is permissible—and denying such care as the result of animus—which is not," is flatly contradicted by the Final Rule's plain language. No health programs, "any part of which is receiving Federal financial assistance," 89 Fed. Reg. 37,693, may "[h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care." 89 Fed. Reg. 37,701. In other words, no state or health care provider may refuse to pay for or perform, "gender transition or other gender-affirming care," and any state law that does is preempted. 89 Fed. Reg. 37,535. Likewise, prudential State legislation against—for

example—sterilizing surgeries on minors performed as "gender transition or other gender-affirming care" must give way to the radical gender ideology of the Final Rule. This Court should see the obfuscation for what it is.

## B. The Final Rule is unlawful.

The Previous Administration's attempt to import *Bostock*'s Title VII analysis wholesale into Section 1557 fails for two independent reasons. First, the Supreme Court expressly cabined *Bostock*'s reach to Title VII and disclaimed any suggestion that its logic would mechanically extend to other statutory contexts. That makes sense, as Title IX and Section 1557 address areas—education and healthcare—where biological sex is relevant in a way that it is not to employment. Second, the district court properly recognized the difference between Title VII's prohibition on discrimination "because of" sex and Title IX's ban on discrimination "on the basis of" sex. *Bostock* imbued the former phrase with sweeping breadth, but neither this Court nor the Supreme Court has given the latter phrase an equally capacious meaning. The Previous Administration must offer a compelling reason to treat these distinct statutory phrases as indistinguishable, but it comes up short. Simply put, *Bostock*'s logic begins and ends with Title VII.

### 1. The Supreme Court's reasoning in *Bostock* does not apply to Section 1557.

The Previous Administration never meaningfully engages with Title IX's text in their opening brief. Its entire argument instead hinges on importing *Bostock's* holding into a different, unrelated statute that was enacted nearly a decade later, pursuant to a separate constitutional power. Not only does this approach contradict the statute's

plain language, as Plaintiff States explain below, *see infra* Part II.B.2, but it ignores the legal and practical realities that distinguish Title IX from Title VII. Despite the Previous Administration's insinuations to the contrary, the Supreme Court "was clear on the narrow reach of its decision" in *Bostock*. *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). The decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," such as Title IX; nor did it address other issues that were not before the Court such as "sex segregated bathrooms" and "locker rooms." *Bostock*, 590 U.S. at 681. It resolved only a single question: "whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" *Id.*

The Supreme Court had good reason for its refusal to "prejudge" how *Bostock*'s holding would apply to laws outside of Title VII. *Id.* When interpreting statutes, courts must "examine how" a word or "clause is linked to its surrounding words" in order to "give effect, if possible, to every clause and word of [the] statute." *Fischer v. United States*, 603 U.S. 480, 486 (Jun. 28, 2024). "To that end," courts must consider "the specific context in which [the word or clause] appears" *as well as* "the broader context of the statute as a whole." *Id.* (citations omitted). In other words, it matters that Congress enacted a different statute for a different purpose because "what counts as discrimination under one statute is not necessarily discrimination under the other." *Texas v. Cardona*, 743 F. Supp. 3d 824, 881 (N.D. Tex. 2024). Where the Previous Administration goes awry is that they assume, without

authority, that a person's biological sex has no bearing on the actions regulated by the Final Rule, but this is incorrect.

As the district court observed, "Title VII is concerned with discrimination in employment, where '[a]n individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees," ROA.219 (quoting *Bostock*, 590 U.S. at 660). Title IX, in contrast, "addresses discrimination in education, and Section 1557 is concerned with discrimination in healthcare—areas of life in which an individual's biological sex is often relevant and sometimes critical," if not lifesaving. *See Adams*, 57 F.4th at 808 (distinguishing *Bostock* in analyzing Title IX in part because Title IX "is about schools and children—and the school is not the workplace."). Indeed, HHS admitted as much in a recent press release, when the new Assistant Secretary for Women's Health explained, "In health care, sex distinctions can influence disease presentation, diagnosis, and treatment differently in females and males." Accordingly, "biological differences between females and males require sex-specific practices in medicine and research to ensure optimal health outcomes."

Far from being discriminatory, a transgender patient's biological sex is an indispensable component to their evaluation and treatment. *Bostock*'s reasoning is inapposite and should not control.

## 2. The district court correctly interpreted Title IX.

The Previous Administration asserts that the district court propounded a "fundamentally incorrect understanding" of Title IX's text, arguing that the district court improperly distinguished between Title IX's prohibition on discrimination "on the basis of" sex and Title VII's bar on discrimination "because of" sex.

Appellants' Br. at 21-23. In the Previous Administration's view, a proper reading of these two statutory phrases would elide any distinction and consider each to be synonymous with the other. But the district court properly recognized that only one of those phrases has been freighted with a particular and far-reaching meaning under established precedent. *Bostock* interpreted "because of" in the Title VII context to infer a "sweeping [] but-for causation standard," but neither this Court nor the Supreme Court has attached a correspondingly broad meaning to the phrase "on the basis of." *Bostock*, 590 U.S. at 657. The Supreme Court has, on the other hand, specifically warned against attempting to apply Bostock's reasoning "beyond Title VII to other federal or state laws that prohibit sex discrimination." *Id.* at 681. It is not the district court's responsibility, then, to explain to the Previous Administration "how Title VII's prohibition on discrimination 'because of' sex means something different than Title IX's prohibition on discrimination 'on the basis of' sex." Appellants' Br. at 23. It is the Previous Administration's responsibility to explain to this Court why *Bostock*'s holding should be applied far afield of the Title VII context to which the Supreme Court expressly limited it.

The Previous Administration's efforts to provide such an explanation come up short. The Previous Administration correctly notes that the *Bostock* court and this Court have sometimes used "because of" and "on the basis of" interchangeably. Appellants' Br. at 23-24. It then incorrectly posits that "because of" in Title VII carries the same meaning as does "on the basis of" in Title IX. But "just because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context." *Neese*

*v. Becerra*, 640 F. Supp. 3d 668, 678 (N.D. Tex. 2022) (emphasis in original), *vacated and remanded on other grounds*, 123 F.4th 751 (5th Cir. 2024). "[T]he language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373-74, (2023) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). To be sure, the statutory language here does require parsing, because "[g]iven the differences between Title VII and Title IX, what counts as discrimination under one statute is not necessarily discrimination under the other." *Texas v. Cardona*, 743 F. Supp. 3d at 881. But treating fungible opinion phraseology as the equivalent of identical statutory language only obfuscates the meaning of Title IX.

Further, any doubt about the proper meaning of Title IX must be resolved in favor of the Plaintiff States. The Previous Administration's only claimed authority to promulgate the Final Rule is Congress' grant of authorization to "promulgate regulations to implement [Section 1557]." Appellant's Br. at 3; 42 U.S.C. § 18116(c). This authority to *implement* is distinct from the authority to *rewrite*, and is subject to the judicial duty to "independently identify and respect [constitutional] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Mayfield*, 117 F.4th at 617 (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 404 (2024)). If The Previous Administration wishes to impose a wholly new condition on billions of dollars in federal healthcare funding, they offer more than mere interpretive ambiguities as the basis for its Final Rule.

## C. The Previous Administration lacks authority to implement the challenged provisions of the Final Rule.

The Previous Administration lacks the authority necessary to unilaterally adopt by rule a wholesale change to the meaning of "on the basis of sex" in Title IX and Section 1557. Such a change would have vast political and economic significance, and under the major questions doctrine Congress must speak clearly if it intends to vest an agency with such vast authority. Congress has not so spoken. And enforcing such a change by threatening to cut off billions of dollars in vital federal healthcare funding implicates the Spending Clause of the U.S. Constitution. Under this clause also, Congress also must speak clearly if it intends to impose conditions on the recipients of federal spending. And Congress has not so spoken.

### 1. The challenged provisions of the Final Rule violate the major questions doctrine.

The major questions doctrine requires that courts apply "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue." *West Virginia v. EPA*, 597 U.S. at 722-23 (cleaned up). Congress does not "typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme," and is "presume[d] . . . to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (internal quotations omitted).

Agency action engenders a major questions problem where an agency either (1) "claims the power to resolve a matter of great political significance," (2) attempts to "regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities," or (3) "seeks to intrude into an area

that is the particular domain of state law." *Mayfield*, 117 F.4th at 616 (quoting *West Virginia v. EPA*, 597 U.S. at 743-44 (Gorsuch, J., concurring)).

Under these indicia, the Final Rule qualifies for review under the major questions doctrine. The Previous Administration could hardly have chosen a more "polarizing political issue" to address by Rule than the definition of sex discrimination. *Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 401 (W.D. La. 2024). And as the district court acknowledged, conditioning billions of dollars of healthcare funding—the loss of which "would devastate [Medicaid and CHIP] programs and their beneficiaries"—on compliance with the Previous Administration's abrupt redefinition of sex discrimination creates an issue of enormous economic significance. ROA.223.

Where, as here, the major questions doctrine applies, an agency either cannot act—because the "decision . . . must rest with Congress itself"—or can act only "pursuant to a clear delegation from [Congress]." *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023) (quoting *West Virginia v. EPA*, 597 U.S. at 735). In its Final Rule, the Previous Administration claimed such a delegation, citing three provisions of the Social Security Act: sections 1902(a)(4), 1902(a)(19), and 2101(a) of the Social Security Act (codified at 42 U.S.C. §§ 1396a(a)(4), 1396a(a)(19), and 1397aa(a), respectively) as authority to promulgate the relevant sections of its Final Rule. ROA.220-21; 89 Fed. Reg. 37,668. But even in the Previous Administration's telling, these provisions are nothing more than boilerplate enabling statutes that permit "methods of administration necessary for the proper and efficient operation of the Medicaid State plan," safeguards to "assure that covered services are provided in a manner

consistent with the best interests of the recipients," and distribution of funds enabling states to "initiate and expand the provision of child health assistance to uninsured, low income children in an effective and efficient manner." 89 Fed. Reg. 37,668. The district court is rightly "confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." ROA.222 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

The Previous Administration's appellate briefing makes no mention of the sources of statutory "authority" relied on in the Final Rule. Instead, it highlights a limited congressional delegation to "promulgate regulations to implement [Section 1557]." Appellant's Br. at 3; 42 U.S.C. § 18116(c). But authority to *implement* is not authority to *rewrite*. It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 328 (2014). But the Previous Administration's briefing makes only the barest pretense of compliance with this core principle. The slender congressional authorization to implement Section 1557 cannot support a Final Rule which transplants *Bostock*'s interpretation of Title VII into the context of Title IX to effect a comprehensive overhaul of healthcare policy.

### 2. The challenged provisions of the Final Rule violate the clear-statement rule required by the Spending Clause.

In our system of constitutional governance, the authority to tax and spend is the first among Congress' enumerated powers. U.S. Const. art I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay

the Debts and provide for the common Defence and general Welfare of the United States."). Congress' spending authority, while vast, is nonetheless "not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The first of these is that if Congress wishes to set conditions for the receipt of funds disbursed under its Spending Clause power, it must "speak with a clear voice," so that States considering whether to accept certain funds under certain conditions are "cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The conditions also must be related to the "federal interest in the project," the spending itself must not "induce the States to engage in activities that would themselves be unconstitutional," and the spending must not "be so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 207-11 (internal quotations omitted). Each of those requirements "is 'equally important' and must be 'equally' satisfied to find that a spending condition comports with the Constitution." *Cardona*, 743 F. Supp. 3d at 885 (quoting *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023)). Since Title IX was "passed pursuant to Congress's power to impose conditions on recipients of federal funds under the Spending Clause," and the Final Rule conditions receipt of federal healthcare funds on compliance with a reinterpretation of Title IX, the Final Rule is subject to these restrictions. *Cardona*, 743 F. Supp. 3d at 885.

The Final Rule violates these restrictions. First, the "spending power . . . does not include surprising States with post-acceptance . . . conditions." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 584. But the Final Rule effectuates a bait and switch—

attaching a brand-new and unforeseeable interpretation of sex discrimination to federal funding that Plaintiff States are already accustomed to receiving. *Bostock* did not involve an agency interpreting its delegated authority, so whether an agency could of its own accord impose such a condition went undiscussed—and *Bostock* expressly held that its interpretation was unexpected. 590 U.S. at 649, 653, 674-81. That holding cannot be reconciled with an argument that Congress spoke clearly on this unexpected condition abruptly read into Title IX. Plaintiffs could not have known that the Previous Administration would claim the power to require them to abandon state laws and pay for gender-transition procedures as a condition of funding. Second, the conditions of the Final Rule actively cut against the federal purposes of antidiscrimination in the Title IX and healthcare contexts. *See supra* Part II.B.1. And finally, the quantities of healthcare funding threatened by enforcement of the challenged provisions of the Final Rule are coercive to the point of compulsion. *See* ROA.223 (noting the "billions of dollars in HHS-administered federal financial aid" received by Texas and Montana, the loss of which would "devastate" the Medicaid and CHIP programs). Because the Final Rule does not comply with the strictures of the Spending Clause, promulgating the Final Rule was contrary to law and exceeded the Previous Administration's authority.

## III. The Relief Ordered by the Court was Proper.

### A. The scope of relief ordered by the district court was necessary to address the States' asserted harms regarding gender-affirming care.

The Previous Administration has not met its burden to show that portions of the Final Rule should be severed. The Previous Administration claims the "district court erred in staying the Rule as to certain challenged provisions because the breadth of this relief was not necessary to remedy the States' asserted Injuries." Appellants' Br. at 34. They argue the district court should have limited the preliminary injunction to just the provisions of the Final Rule on gender-affirming care or, at most, gender identity discrimination. *Id.* at 34-38. But this argument ignores Plaintiffs' broader challenge to the Final Rule's wholesale redefinition of "[d]iscrimination on the basis of sex," ROA.18 (quoting 89 Fed. Reg. 37,699), which "permeate[s] the Final Rule." ROA.230. Indeed, the injury to the States extends far beyond the provisions cited by the Previous Administration. In addition—as in the district court—the Previous Administration fails to grapple with the severability analysis, leaving this Court to speculate on the practical implications of a partial stay. This perfunctory approach falls far short of meeting the Previous Administration's burden.

And just as in the district court, the Previous Administration spills little ink telling this Court how it should—or even could—craft workable relief based on the portions of the Final Rule that the Previous Administration claims is severable. *See generally* ROA.244-52; Appellants' Br. at 34-38. Rather, the Previous Administration spends the bulk of its briefing arguing that only the portions of the Final Rule that Plaintiffs "actually challenged" should be stayed. Appellants' Br. at 34-38. But this

assertion not only mischaracterizes Plaintiff States' claims, but it also glosses over the fact that the deficiencies in the Final Rule, which cause the States' injuries, "permeate the Final Rule." ROA.230. Beyond that, the district court already "limit[ed] the stay of the effective date of the Final Rule only to the sections subject to [Appellees'] challenge." ROA.350.

Even setting that aside, the Previous Administration bases this portion of its brief on the assumption that Plaintiff States only challenged the Final Rule to the extent that it would require them to perform and subsidize harmful gender-transition procedures. Although State Plaintiffs certainly highlighted this aspect of the Final Rule, they also made clear that they protested the Final Rule's redefinition of "[d]iscrimination on the basis of sex" generally, *see*, *e.g.*, ROA.18, 25-26, 94-97, as well as any regulation therein that incorporated or relied on this reimagination of the statutory text. *See*, *e.g.*, ROA.23, 32-33, 125-128 (challenging provisions related to pregnancy and abortion). The provisions that compel States to perform and subsidize gender transitions simply represent among the most egregious applications of the expanded definition since they undermine state sovereignty and imperil public safety by facilitating unnecessary and life-altering surgeries on patients, including minors, who cannot consent to the procedures.

The district court correctly determined that it needed to stay enforcement of all provisions implicated by the Previous Administration's reinterpretation of "[d]iscrimination on the basis of sex" in order to provide Plaintiff States with full relief that avoided irreparable injury. Yet even now, in its briefing before this Court, the Previous Administration does not engage in proper analysis of the Final Rule

provisions it cites. Indeed, nowhere in the present briefing does the Previous Administration show that it would have initiated rulemaking, much less promulgated the remaining regulations into the Final Rule, but for its persistent objective to read gender identity into Section 1557. Besides, § 705 authorizes a district court to stay as much of the Final Rule as is necessary and appropriate to prevent the States from suffering irreparable injury. The Previous Administration therefore had the burden of establishing (1) that the Final Rule would "function sensibly" and (2) that the Previous Administration "would have adopted the same disposition," even if all regulations incorporating or relying on the Previous Administration's misinterpretation were stricken. *Texas v. United States*, 691 F. Supp. 3d 763, 788 (S.D. Tex. 2023), *aff'd in part, modified in part*, 126 F.4th 392 (5th Cir. 2025). It established neither. Nor does it even attempt to engage in such an analysis here. To the contrary, there is "substantial doubt" that the Previous Administration would have adopted an emasculated form of the Final Rule. *Balt. v. Azar*, 439 F. Supp. 3d 591, 615 (D. Md.), *aff'd*, 973 F.3d 258 (4th Cir. 2020). The chief purpose of the Final Rule is to "implement § 1557's nondiscrimination protections" "consistent with the Supreme Court's decision in *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)." ROA.135. Erasing major provisions fatally undermines the rationale for the rule. *See Balt.*, 439 F. Supp. 3d at 615.

Since Plaintiff States have not provided any briefing on the matter, even if this Court wished to engage in a severability analysis, the Previous Administration's scant briefing on the issue puts the Court in the "untenable position" of having to "parse the [181] page Final Rule [itself] to determine the practicability and

consequences of a limited stay." *Murrill*, 2024 WL 3452887, at *2. That is not this Court's job. *See Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) ("[J]udges are not like pigs, hunting for truffles buried [in the record].") (citation omitted, alterations in original). This is especially true at the preliminary injunction stage, where the district court has the discretion to craft a "temporary order [that is] broader than final relief" so that it may consider the intricacies of the parties' claims and defenses without risking irreparable injury. *Louisiana by & through Murrill v. United States Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *2 (5th Cir. July 17, 2024) (citation omitted). The Previous Administration's lack of briefing on this issue essentially calls this Court to engage in an unled, roving severability analysis of the Final Rule. But the district court has already—rightfully—declined the Previous Administration's invitation for it to do the heavy lifting on this point. ROA.230. This Court should do the same.

## B. The district court did not abuse its discretion in granting nation-wide relief.

Last, the scope of a § 705 stay of agency action aligns with the universal scope of vacatur under § 706. The Previous Administration argues that "the district court . . . should have limited the geographic scope of any relief to the named plaintiffs in this case." Appellants' Br. at 38. But this argument misunderstands the nature of preliminary relief under § 705. That is because the scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706." *Career Colls.*

*and Schs. of Tex.*, 98 F.4th at 255.[1] And the "scope" of ultimate relief under § 706 is "'nationwide . . . not party-restricted,'" "and 'affects all persons in all judicial districts equally.'" *Braidwood Mgmt., Inc. v. Becerra*, No. 23-10326, 2024 WL 3079340, at *13 (5th Cir. June 21, 2024) (quoting *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) and *Career Colls. and Schs. of Tex.*, 98 F.4th at 255). This makes sense. If a court has the power to ultimately universally set aside an unlawful regulation under §706,[2] it must have the ability to do the same in a preliminary posture under § 705.[3]

Even setting aside that § 705 stays are inherently universal, the Previous Administration's arguments on this point continuously conflate the meaningful distinctions between a § 705 stay and "universal" or "nationwide" injunctions. Appellants' Br. at 39-43. Like vacatur, a stay functions *in rem*, operating directly against

---

[1] This Court's reading accurately reflects the difference between the APA context—where vacatur of a rule "for everyone" is the normal remedy, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) (citation omitted); *see Career Colls. and Schs. of Tex.*, 98 F.4th at 255—and non-APA cases involving requests for equitable relief that flow to particular parties. *Cf. Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 1 n.1 (2023) (Kavanaugh, J., concurring in denial of stay) (explaining difference); *see also* Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 VA. L. REV. 933, 950 (2018) ("[T]he [APA] establishes a unique form of judicial review that differs from judicial review of statutes.").

[2] Strikingly, the Previous Administration argues that the APA does not authorize universal vacatur at all. Appellants' Br. at 43 n.10. But this Court has recently considered—and rejected, this argument. *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (rejecting argument that the APA "may not authorize vacatur at all" and noting how vacatur is the remedy recognized by "[b]inding Fifth Circuit precedent").

[3] Otherwise, the power to afford meaningful final relief in the form of vacatur would be diminished. Once an illegal rule begins to be applied, the "egg has been scrambled," *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *see also* Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1126, 1158 (2020) (arguing that courts reviewing agency action under the APA are "on firm footing" when issuing universal stays to preserve the status quo pending judicial review").

the agency action, rather than against a person. A stay works "by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (citing Black's Law Dictionary 1413 (6th ed. 1990)). In contrast, an injunction operates *in personam* by directing an individual to act or refrain from acting. *Id.* at 428. Both types of relief have the practical effect of stopping the agency from acting, but in different ways. *See VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 692 F. Supp. 3d 616, 632 (N.D. Tex.)*, vacated sub nom. Garland v. Blackhawk Mfg. Grp., Inc.*, 144 S. Ct. 338 (2023). An injunction prevents agency action by subjecting agency personnel to contempt if they exercise their enforcement authority, while a stay "prevent[s]" agency action "by temporarily suspending the source of authority to act—the order or judgment in question." *Nken*, 556 U.S. at 428-29. Put another way, a stay "temporarily voids the challenged authority." *Id.*; *see also Career Colls. and Schs. of Tex.*, 98 F.4th at 255; *contra* Appellants' Br. at 42 (citing *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024), which involved the Court eschewing a lower statutory standard to obtaining a traditional injunction but that did not concern—or even mention—a stay under § 705)).

Like vacatur under § 706, a stay under § 705 is the APA's default preliminary remedy. *See Texas v. United States Dep't of Transportation,* 726 F. Supp. 3d 695, 724 (N.D. Tex. 2024) ("[T]his Court is bound by Fifth Circuit precedent that has continually maintained that vacatur is 'the appropriate remedy' by 'default.'" (quoting *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022)). This Court recognizes a stay as the "less drastic" remedy. *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd for lack of jurisdiction*,

602 U.S. 367 (2024). A stay "does not order the defendant to do anything." *Id.* It "neither compels nor restrains . . . further agency decision-making," *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), and it doesn't apply *in personam* on threat of contempt, *see Nken*, 556 U.S. at 428. While courts retain the authority to issue a more limited remedy, "a more limited remedy is *not* party-specific vacatur." *Texas v. United States Dep't of Transp.*, 726 F. Supp. 3d at 725 (emphasis added). When a regulation is challenged before it takes effect, the straightforward means of staying the regulation is to temporarily postpone it by "delay[ing] the effective date." 5 U.S.C. § 705. That "simply suspends" agency "alteration of the status quo." *Nken*, 556 U.S. at 429 (cleaned up). Such a delay is the least burdensome means of maintaining the status quo. *See Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1144 (5th Cir. 2021).

Simply put, the scope of preliminary relief under § 705 tracks the scope of the nationwide, non-party-restricted "default" remedy for agency action that violates the APA—vacatur. *Career Colleges and Schools of Texas*, 98 F.4th at 255. National relief also matches the national scope of the unlawful Final Rule's reach. *See id.* ("The Department's protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards."); *cf. Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation") (citation and internal quotation marks omitted). This Court should affirm the district court's grant of relief.

## Conclusion

For the foregoing reasons, this Court should dismiss this action as moot in consequence of subsequent executive action, or in the alternative should affirm the district court's nationwide § 705 stay of the challenged provisions of the Final Rule.

Respectfully submitted

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General

JACOB C. BEACH
Assistant Solicitor General

/s/ Kathleen T. Hunker
KATHLEEN T. HUNKER
Deputy Chief, Special Litigation

GARRETT GREENE
Special Counsel

MARK A. CSOROS
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
Kathleen.Hunker@oag.texas.gov

*Counsel for Plaintiffs-Appellees State of Texas*

AUSTIN KNUDSEN
Montana Attorney General

CHRISTIAN B. CORRIGAN
Solicitor General

/s/ Peter M. Torstensen, Jr.
PETER M. TORSTENSEN, JR.
Deputy Solicitor General

Montana Department of Justice
P.O. Box 201401
Helena, MT 59620-1401
406-444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Plaintiff-Appellee State of Montana*

## CERTIFICATE OF SERVICE

On February 26, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER


## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,880 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER